The defendant, Herman Casey, was tried upon a bill of indictment charging him with murder in the first degree of James C. Causey. A verdict of guilty of murder in the first degree on the bill of indictment was returned by the jury, and the defendant was thereupon sentenced by the court below to death by electrocution.
The evidence was to the effect that James C. Causey was from Suffolk, Va., but was living in Goldsboro, N.C. prior to 3 July, 1930, and was working for the Atlas Plywood Corporation. It had bought out the Utility Manufacturing Company, and he was in charge of the logging operations in the woods. Causey drove a Hudson coach, belonging to the company. The defendant Casey knew Causey and who he was working for. Defendant Casey was hauling some hogshead stave timber during the summer of 1930, shortly before 3 July, 1930, off the land of one John H. Sutton. There was a controversy between Sutton and the Utility Manufacturing Company (then owned by the Atlas Plywood Corporation, located at Goldsboro, N.C.), over who owned the land the timber was cut off of. Some of this timber was sold by defendant Casey to Goldsboro Lumber Company, at Dover, N.C. some three or four weeks before 3 July, five and three-fourths cords amounting to some $28.75. The Goldsboro Lumber Company was notified by one E. H. Graham, an officer of the Atlas Plywood Corporation, to stop payment, which was done. Defendant Casey, as testified to by one Blandford, connected with the Goldsboro Lumber Company, on 3 July, the day it is alleged Causey was killed about eleven-thirty or one-thirty, was trying to get the money, claiming it was coming to him and that he understood bond had been executed for the timber. He told John Bryant, who he was hauling lumber for, on the morning of 3 July, having delivered *Page 188 
some timber to the Goldsboro Lumber Company at Dover, N.C. where defendant left him about eleven o'clock, that he got balled up with the Goldsboro Lumber Company about $35.00.
E. H. Graham testified, in part: That he knew defendant Casey. "The latter part of May or first of June. He came over there to see about some money that had been withheld at Goldsboro Lumber Company. He did make a statement in reference to it. Q. What was it? (Defendant objects unless it refers to Mr. Causey.) He said `I am going to have my money, somebody is going to pay me.' (Defendant objects to answer and asks that it be stricken out; overruled; defendant excepts.) I did refuse to pay him the money and did not permit him to be paid. I was manager. The money that I am talking about was to be paid at Dover. The litigation was between Utility Manufacturing Company and Mr. Sutton, about the timber. . . . I don't know whether Mr. Casey knew Mr. Causey or not. As I recall it, I told Mr. Casey that Mr. Causey had charge of the logging operations."
Luby Underwood, testified, in part: "While we were hauling from Mr. John H. Sutton's place Mr. Casey had to stop hauling. There came a man down from Goldsboro. Mr. Casey was with me at the time. Mr. Casey was with me and we were coming down in woods riding in the truck together. It was in June. (Defendant objects to this; overruled, and the defendant excepts.) We come on down the woods with a load and he was going to Dover to get some chewing tobacco and he got out on the road and a car was standing there, over there to the left at the bridge and the man got out of his car and asked if he was Mr. Casey and Mr. Casey said, yes, and he wanted to know of Mr. Casey where he was getting his timber from. (Defendant objects and excepts to above testimony; overruled; exception.) This gentleman asked him who he was buying his timber from and Mr. Casey told him from Mr. John H. Sutton, and he wanted to know how much he had gotten out of there and Mr. Casey told him he did not know. (Defendant objects and excepts to above; overruled; exception.) The gentleman in the car, the car was from Goldsboro, but I could not swear where the man was from, he said to Mr. Casey, `Don't get any more timber out of that piece of woods down there and not to cut any more out of there.' He pulled out some map and begun to show Mr. Casey about the map, and Mr. Casey stopped and did not get any more out of there and he quit and moved over to Mr. Tilgham's tract of land. (Defendant objects and excepts; overruled, and exception.) This man was driving a large car, I don't know the name of it. . . . That night we come to town and he paid us but not all. His talk was that this man owed him this money at Goldsboro where he went to see, and the way he talked, said *Page 189 
`the G__ d___ son of a bitch, he was going down there, said wherever he met this G__ d___ son of a bitch, wherever he met him he was going down with him.' (Defendant objects and excepts to above testimony; overruled; exception.)"
Peter Brown testified, in part: "The next week we worked at the John H. Sutton place, still working for Mr. Casey sawing stave timber. Something happened while we were working there that stopped us working on the John H. Sutton place on Friday night of that same week. Q. Did Mr. Casey tell you why you stopped working there? (Defendant objects in apt time to all this line of testimony; overruled; defendant excepts.) A. Mr. Casey told me the next week that they objected to him cutting and hauling any more of that timber out of there. The next week we worked on Mr. Pete Tilgham's place, cutting stave timber. . . . A. He said Friday when he left that he had to go to Dover, that somebody was going to pay him his money. (Defendant moves to strike out this evidence; overruled; defendant excepts.) . . . On Monday he stated that he would rather be laying flat of his back in the sunshine with his toes bound together than for anybody to beat him out of his labor. (Defendant moves to strike out above; denied, and defendant excepts.)"
John Anthony Brown testified, in part: "He said he went to Goldsboro Monday to get our money. On Monday he carried us to the woods and put us to work and told me he was going to Goldsboro to get the money. (Defendant objects; overruled, and exception to the above.) He came back that night and paid us off across the street yonder and told us he borrowed the money from the company at Dover. He told us about his money being stopped. He told me on the way going to Greene County `You just as well be dead with my toes turned up to the sun as to be working and can't get our labor.' (Defendant objects; overruled; exception.)"
Thurman Morris testified, in part: "It was this summer. . . . Q. Did you hear Herman Casey make any statement in reference to any money that was held up, whether he had been to get his money? (Defendant objects; overruled; defendant excepts.) I went down there one afternoon and I heard him say a fellow in Dover owed him some money and he went for it and could not get it, and he said `Damn if he did not aim to have it on some terms.' (Defendant objects; overruled and exception.)"
C. S. Cornwell, testified, in part: "Yes, I know Mr. J. C. Causey, had known him about 15 years. I last saw him on the morning of 3 July; it was about 10 o'clock that he left the office. I do know that he had business at what is known as Caswell Camp, near Kinston, on that *Page 190 
day. When he left the office he was driving a Hudson coach. Yes, I have seen the car that was burned and I know of my own personal knowledge that the burned car was the car that was driven by Mr. Causey on that day. The car belonged to the Company."
Henry West testified, in part: "I live about a mile and a half from where the car was burned, out towards Kelly's Mill. I knew Mr. Causey when I saw him, and I saw him on 3 July; at the time I saw him he was going in the direction of where the car was burned. He was driving a Hudson car; it was about 11:30. I saw smoke in the direction of where the burned car was found about 12 o'clock that day, but I could not say whether it was that car burning that I saw the smoke from, or not. There was no other fire around there that day I know of."
Decatur Nobles testified, in part: "I knew Mr. J. C. Causey when I saw him, had known him since November. I saw him on Thursday, 3 July, he passed my house driving a Hudson coach, going towards Oak Bridge, around toward Route No. 10 from my house; he was going toward the scene of the accident when I saw him, toward where the car was found burned. As near as I could guess at it I would say it was between 11:00 and 11:30. I never looked at the clock to see the exact time. I had just gone to the house from topping some tobacco, and I later saw the smoke from the fire. I think it was about half an hour after I saw Mr. Causey pass before I saw the smoke. That is just guessing. Right around 12 o'clock is as near as I can get at it that I saw the smoke. . . . Was present on the 4th where the car was burned. . . . The front of the car was about 20 or 25 feet from this little road that crossed the tram road. I saw some bushes right side of the car it looked like it had been beaten out with a brush or something of that sort. That was on the left of the car next to the Neuse road and on the side away from the tram road, west approximately from the car."
Jerry Sutton testified, in part: "I was at home on 3 July. I worked in the tobacco patch, about 50 steps of the road, was about 50 yards of the road when Mr. Causey passed by. I knew Mr. Causey. It was about 11:20 or 11:30 when Mr. Causey passed; he was driving what looked to be a Hudson coach, but I could not swear as to the make of the car. It looked like the same car he had been driving since he had been coming down there. When he passed he was running 35 or 40 miles an hour. It is a pretty good road by my house, at that time they had just drug the road and had piled a lot of loose dirt in the middle of the road and it was dry and it was pretty tough at that time."
Milton Wood testified, in part: That on 3 July, he was staying with his mother near Fort Barnwell. "I got up with Mr. Herman Casey *Page 191 
at Sam Smith's house. I was at Sam Smith's house and Mr. Casey came along and I waved him down and asked him how his truck drove and asked him how about getting a job with him, and he said he did not know, to come with him and he would let me know later. . . . After he turned off on this road he drove down a mile or more down to a little by road, after a while he came to a little small piece of woods, and I asked him where he was going, and he said he was going down through the islands. After a little while he got to a railroad, and I looked up ahead of me just before we got to the railroad and saw this big car coming. Mr. Casey drove up to the foot of the railroad and stopped his truck and got on the ground and by that time Mr. Causey in the car ahead of us had stopped his car. The railroad was between them and Mr. Causey could not pass this truck. Mr. Casey was already on the ground, and he walked around on the right-hand side of Mr. Causey's car, and Mr. Casey reached in his pocket and got a black looking pistol from his pocket. I could not swear as to the pistol (shows witness pistol). This looks like the pistol. I remember this little piece here on the side of it. He had it about this close to my face (indicating). Mr. Casey took his pistol out and shot Mr. Causey twice and Mr. Causey's head fell backwards, and after he was dead he come back to the truck where I was and he told me if I told it he would kill me if I was the last one on God's earth, and I told him I would not tell it, and he put his pistol back in his pocket and went back to the car and opened the car and got Mr. Causey around the shoulders and dragged him on the ground and got down kinder on his knees and searched all his pockets and pulled some money out of his right-hand pants pocket; I don't know how much money he got; I saw money sticking out of the edge of his hand, it was paper money. He pulled him out the right-hand side of the car. At that place it is little fine old dead looking grass along down where he pulled him out. It was right on the edge of the road, right at the edge of the car. After he pulled him out and searched him and got what he wanted off of him, he took him up in his arms and after two or three lunges he got him back in the car. He got him in the back seat, but what position he laid him in the back seat I could not see; he got in the car and backed it off in the woods and come back to the car and got a pint bottle and he goes behind the car and then comes to the right-hand side of the car and raises the hood up, and when he gets up he has a pint bottle of gas and he opens the door of the car and pours over half of the gas on Mr. Causey and strikes a match to him and the fire blazes up and the rest of the gas he poured on the car and struck a match to that; and he came back to the car and got up in the truck and drove back down the road. He came off where this *Page 192 
other road comes in. He started to turn around but his mind changed and he never turned around, and he went down to Jasper Tyree's filling station and asked for gas but he did not have any gas, and then he drove off on down by the oak bridge and after he gets to a little road that turns off from the highway after you cross the bridge he turned around and comes back the same way he went before except as he got right to the car instead of turning off this little piece of woods road he went around another road. When he went across the oak bridge and turned around and came back he went right back in by Jasper Tyree's filling station, the same way he came out. He passed the same little road he came out of from the car, he went up that road a half mile or more, then he turned off to the left and came back into this old road lying out field, and turned back in by this car, and stopped and broke a little sweet gum bush and put out some fire around the car. . . . We went down the Greenville highway and turned off to the left on a dirt road and went 5 or 6 miles, and he came to where he had his washing done, and he got out and went up on the porch. . . . He asked me to draw him some water in a tub, and I drawed about half a tub full and he kept talking about he was so cold he did not think he could take a bath. I hope him carry the water in the tin tub in the room, and when he come out from his bath he had on a clean shirt. He never changed anything else that I know of. . . . Then he drove on out by the Greenville fork and he stopped at the filling station and called me over behind a Whippet car and tells me `Look here, don't think this will be the last time. I will see you, I will see you sooner or later, if you ever tell it you will never tell anything else'; and I told him I would not tell it, and he told me what to tell if they got me up on the stand. He said, `You get up there and tell that we come through those woods and saw this car burning and that the top had fallen in and that we got out of the truck and looked at the car and saw the gas tank had not bursted and went on.' He said `you better stick to that and you better not tell anything else.' . . . The detective also told me if I knowed anything to tell the truth about it. I was guarded while in jail here because I told the truth on the man; I knowed him brothers would get me. Yes, sir, the first statement I made about this thing was that Mr. Casey did not have anything to do with the killing and the statement that I made to those men in the jail in Wilson was that Mr. Casey did not have anything to do with it. . . . I think it was pretty close to 1:30 or 2 o'clock when we got there. I have not said he set the car afire at 11:30 o'clock. I have heard what the other witnesses said about it. A colored man said he saw the smoke about 11:30. Yes, sir, all the witnesses except me have said the smoke was *Page 193 
between 11:30 and 12 o'clock. . . . I could not say for certain whether there was any blood on Mr. Casey's shirt; I think there was. I can't remember every word I testified to before. I don't know whether there was any blood or not. If I am not mistaken I said there might be some on his left-hand sleeve, right along here (indicating), between elbow and shoulder. That is all the blood I remember seeing on Mr. Casey. Yes, sir, I say Mr. Casey took his pistol and shot Mr. Causey twice and dragged him out of the car and placed him on the ground and put him back without any assistance and did not get a drop of blood on him except the little spot on one of his sleeves. I am nineteen years old or somewhere thereabout, I don't know when my birthday is. . . . None of the officers or anybody has ever told me to tell anything but the truth about this matter. . . . The day I went around this route that Mr. Casey and I took they carried me around there twice. . . . No one forced me to follow the route I did. The last I remember looking at my watch that day was when we come out down there to Mr. Tyree's filling station, and it was 12 o'clock by my watch. That was the first time and not after we went back in there. My watch was not keeping good time and I would be about an hour or more out of time. I had had it about six months and it was a dollar watch."
Jap Hornder testified, in part: That he and a party were fishing. He saw two colored men who asked the way to the river road. These colored people had no guns. Two reports of a gun were heard in the direction of Decatur Nobles', he lived about three-fourths of a mile from where the car was burned, this report was heard between 10 and 12 o'clock.
Numerous witnesses testified that they saw Casey in a Chevrolet truck with Milton Wood. Afterwards identified and admitted by all to be Milton Wood, going towards the burned car, between 11:30 and 12:30, or about 12 o'clock. That about that time they saw the smoke at the place where the car was found burned the next morning. Some of the defendant's witnesses put it about 1:00 to 1:30 after the car was burned, that they saw defendant and Wood in the Chevrolet truck.
R. T. Jarman, working for the funeral directors, testified, in part: "I got to the scene of the burned car about 10:30 or fifteen minutes to 11 o'clock on 4 July. Mr. Milburn Nobles and Mr. Leo Tilgham went with me. Yes, sir, I saw the defendant, Herman Casey at the scene of the burned car. I heard him make the statement there as I was on the inside of the car at work and he was on the outside talking to Jasper Tyree and some more people; I didn't notice particularly who they were. He said he came through there the day before, 11 and 12 o'clock and saw the car burning and that he got out and went around and looked *Page 194 
at the gas tank of the car and saw that it had not bursted and that he said `Come on boys and let's go.' He did not call any names as to who he was talking to. He also said that when he saw the car or when he was leaving it one that he said `there was a good car that somebody was burning up to get insurance.'"
The identity of the remains of Causey and the car was undisputed.
R. H. Leath, testified, "I have the title to the car. The motor number is 620519 and the serial number 886499. I have checked those numbers with the numbers appearing on the car and they are the same."
R. L. Woodard, Jr., who roomed with Causey in Goldsboro, and had an engagement with him, last saw him alive at 7:20 a.m., Causey did not keep his engagement and Woodard went to look for him. He testified, in part: "I did not find Mr. Causey on my trip. Left there and came out on the New Bern highway back to Kinston and from Kinston to Goldsboro; arrived at Goldsboro 5 minutes to 6 o'clock. I came down here after the car was burned and learned that I had passed near where the car was found on 3 July, when I was looking for Mr. Causey. I have not seen Mr. Causey since that morning of 3 July. (Counsel hands witness key rings, keys which have been identified by witness Jarman as having been found in the burned car.) Witness identifies key rings and other personal effects as having been found in the car as articles belonging to Mr. J. C. Causey, deceased. There is an inscription on the inside of the band ring as follows, `M. C. C. to J. C. C., 27 December, 1900.' That is the date of his wedding. . . . I was present in Suffolk, Va., at Mr. Causey's funeral and was present at the burial; his family, widow and children were present."
S.C. Cornwell, testified as above, and also testified: "When I saw the car it had the appearance of having been backed off of the woods path, just a cut short and backed off in the woods to the best of my recollection about 8 feet or 10 feet from the path. The car was badly burned up. Yes, I noticed that a right good little area had been burned over there; I would say a half acre or possibly more. When I saw the car I noticed that the right hood of the engine was raised and the gas line to the carburetor was disconnected. The right-hand hood over the engine, the side the carburetor was on was open."
Gus Simmons testified, in part: "We three got there about 9 o'clock the next morning, when we got there the cross-ties were burning, but there was no burning around the car at all. . . . It looked like around the car there had been some fire fighting around the car there next to the dirt road. . . . There were some little green pine tops laying around there looked like someone had been fighting fire, that is all I saw." *Page 195 
J. T. Dunn, testified, in part: "I knew Mr. J. C. Causey, had known him 14 or 15 years. I had worked with him around 12 years. I was working with him on 3 July. On 3 July, I was in Goldsboro, the Atlas Plywood Company plant is in Goldsboro. Caswell Camp is the logging camp that belongs to the company, and it is out from Kinston, the mill itself is in Goldsboro. I was in Goldsboro on Thursday. My attention was first called to the fact that there was a car burned in the neighborhood of Caswell Camp around 11 or 11:15 on 4 July, Friday morning. I went to the scene of the burned car; when I got there the coroner's jury was there, a good bunch of men were there. . . . I was there when the key was found something like three or four feet in front of the burned car; Mr. Turner picked the key up; saw him about the time he picked it up; it looked like a switch key to an automobile; Mr. Turner gave the key to Mr. T. G. Sutton, deputy sheriff; it had not been through a fire."
Mrs. B. W. Beddard testified, in part; speaking of the defendant Casey: "He stayed at my home a few days, boarded there. He went there on the last day of June, 1930, and rented a room from me. He took his meals there for some days. At the time he was there he was trucking, hauling logs. Yes, I recall seeing him on 3 July, on Thursday. I saw him that morning about 6:30 o'clock and fixed breakfast for him and he ate. I also fixed dinner for him that day but he did not come for it. I don't know where he was of my own knowledge at that time. He spent the night of 2 July at my house but not the night of 3 July, and he did not take supper that night at my house."
Paul Huffman testified, in part: "I know the roads leading from the Dover road down into where this car was burned. I was in that community on 3 July. I was working on the road from Mr. Geo. West's to Caswell by Jake West's; I think it is known as the British road. There is another road that runs parallel with that road down to the river called the Neuse road. I know the defendant, Herman Casey, when I see him. I saw him on 3 July, right at Jake West's yard; there was not room enough for us to pass each other and he pulled up in Jake West's yard for me to go by. That is about a quarter of a mile from George West's. Mr. Casey was going toward Caswell; that is the general direction of where the car was burned, but not on the same road. He was traveling in a Chevrolet truck. It was about 20 minutes to 12 o'clock. . . . At the time I saw Mr. Casey there was somebody with him, but I did not notice who he was; I was sorter in a right and I just noticed the driver and spoke to him. . . . While we were down there working Mr. Casey came back off of that road, I should say he was gone a little better than one hour, but not over an hour and a quarter." *Page 196 
Mrs. J. C. Coward testified, in part: "I have seen Mr. Herman Casey, have known him when I see him, about one year. I saw him on 3 July. I was sitting at my door and I saw him and a young man on a log truck going down toward Mr. Nobles'. I know where the car was burned, it is between my house and Mr. Nobles. At the time I saw the truck it was going in the direction the car was burned. When I saw the truck go on it was a few minutes after 11 o'clock, and I saw him when he come back. This same young man was with him when he came back but I did not know who the young man was. When I saw Mr. Casey coming back it was between 12 and 1 o'clock."
J. C. Coward testified, in part: "I saw him on Thursday, 3 July; I was cropping tobacco; hardly a mile from my home. I got home right after the bell rung for 12 o'clock. When I saw Mr. Casey he was coming from the way the car was burned, going toward No. 10 highway. I was not home that day before 12 o'clock. At the time I saw Mr. Casey I judge it to be around one o'clock, somewhere thereabout. It was somewhere between 12 and 1:30, we are supposed to get one and a half hours at dinner; I could not say just the time. There was a young man with Mr. Casey at the time but I don't know who he was. I have seen the young man since then up here at the coroner's inquest and it was Mr. Milton Wood that I saw with him on that day."
C. C. Beard testified, in part: "I saw another key picked up in front of the car about three or four feet from the front of the Hudson car, where it was burned. The Hudson was backed out from the little road that comes out from the river road out in the woods, I guess about 10 feet from the little road that crosses the railroad, and this key was found between the automobile and the river road. Mr. J. W. Turner found that key. I saw him pick it up. He gave it to Mr. G. T. Sutton, deputy sheriff. I saw Herman Casey come up there and stayed I reckon 10 minutes and went away and while he was gone the key was found. Mr. Casey came back in 10 or 15 minutes and asked if they had found a key and they told him they had and Mr. Sutton gave him the key I think. If he made any statement about the key I did not hear it. I heard Mr. Casey tell Mr. Evans that he came up there about 12 o'clock 3 July. Mr. Evans asked him in what condition the car was in when he got there and he told him it was on fire but that the fire had not reached the gas tank, and that he said to the fellow who was with him that `We had better get away, the tank has not exploded yet and we had better leave,' and that they hurried on off. That conversation was after the key was found. . . . I saw a jar in the woods out there. I think it was a half-gallon jar; I don't know what was in it, I did not go to it. I don't know who has the jar. *Page 197 
I don't remember who picked it up. I remember it being picked up. I saw it lying out under those bushes. . . . Mr. Casey said he lost it (the key), and he came back looking for it; I know he inquired about it. The best I remember when he was shown the key he said it was his key. Seems like he said he lost his key while walking around there and did not discover it until he got back to his truck. I think the key was handed back to him. It was a perfectly bright key. Mr. Casey took the key and went on to his truck and went off. He said he felt in his pocket and discovered a hole in his pocket and had lost his key out of his pocket."
Jasper Tyree testified, in part: "I don't know exactly what time we got there, between 9:30 and 10 o'clock though. When I got there I saw the burned body in the car and the car was burned up. Mr. Garner had not entered the burned car when I first saw it. From the waist up of the body what was left of the body was in the corner of the back seat with the face down. Mr. Garner turned the body over while I was there. The right-hand side of the hood of the car was raised and the pipe that goes from the vacuum tank to the carburetor was disconnected and a pair of pliers were on the running board. . . . I also saw the fruit jar that has been referred to; it was laying about 10 steps off to the left, back of the car. I picked it up. It had the odor of gas in it, it was a half-gallon jar. . . . Herman Casey came there right after Mr. Garner left. When I first saw him he walked right up behind me, myself and Robert Guzzins were sitting down. Mr. Casey walked up there and said, `Well it is burned up, aint it' and he said, `I was at this car yesterday right around 12 o'clock.' At that time none of the officers had come. Mr. Casey said he walked to the side of the car and looked at the gas tank in the back and saw it had not bursted and that he said to Wood, `Let's go, that tank will go up' and that he got in his car and left; and then he later repeated the same story and stated that he told Wood that he thought somebody had burned the car for insurance. . . . Pretty soon he came back up. At that time nobody had found a key on the ground. Mr. Casey walked up side of me and Mr. Turner was standing next to him, and Mr. Turner stooped down and picked up this key, and Turner said `Here is a key,' and he handed it over to Mr. Guy Sutton, and Casey was standing there and said it was his key, and Mr. Sutton handed it to him. Mr. Turner picked the key up in the path, sorter in front of the car. At that time Mr. Casey had not been over where the key was found while I was there. He did not go in front of the car at any time until Mr. Turner found the key and he walked up and said it was his key; when Mr. Sutton gave him the key he took it and put it in his pocket and he *Page 198 
only stayed there a short time then. . . . I asked Mr. Casey to let me ride with him and he said all right. That was some distance from Neuse road. I went with him to his car where he was parked out on Neuse road, he and I both got in the truck. He did not use the key that Mr. Sutton gave him to start his car; the key was in the switch when he got in the truck. He did not take the key out of his pocket after he left the scene of the fire that day. I rode back to my filling station with him. On the way back Mr. Casey would not talk. I came on down the road about three-quarters of a mile and got up with Herman Johnson and I asked Herman Johnson what kind of truck did he see going through that woods path; Mr. Casey was present, and he said (Johnson) said that he saw a car the day before that go through his field with two white men in it, but that he could not recognize who they were. I don't remember what Mr. Casey said, he said something but I don't recall what. Mr. Casey was mighty nervous, he was sitting there under the steering wheel just in this shape (indicating). After we drove off I kept watching Mr. Casey; he would not talk to me. Mr. Casey was in a nervous condition; he was not a normal man; he was nervous and trembling. He made 3 different movements in his car and kept cutting his eye around at me. He did not get up; I kept my eye on him, watching him. The field Herman Johnson was talking about was back over to where the car was burned."
W. C. Dunbar testified, in part: "Got to the car the morning of 4 July, 12 minutes to 9 o'clock. The car was sitting face to the path, about 10 feet from the path to the front of the car. It was 30 steps from the railroad to the car, 16 steps from the car to where the car stopped and backed back and out back in there. The car was burned up, a total loss. . . . The ground was burned all around the car and had been whipped out around the car and the fire had turned and gone off side of the track, and during the morning the railroad ties had caught and were burning when I got there. There was no fire about the car when I got there. . . . Will Fowler first saw the pistol that has been shown here. The pistol was seven steps or 21 feet from the right-hand front door of the automobile, laying in the wheel track and a large diamond tread tire had been over it and it was wrapped up in the sand. The pistol was toward the railroad from the car. Mr. Garner picked the pistol up. I would not let any one bother it until Mr. Garner came and I showed it to him and he picked it up. . . . I don't recall anybody stating there in the presence of officers or newspaper men that it was Mr. Causey's pistol. I was there when the pistol was picked up. I don't know that Mr. Causey carried a pistol in his car. The little gun he used to carry with him in Virginia was a little *Page 199 
blue steel gun, not an automatic. . . . Mr. Causey was in the back seat of the car. The fire extinguisher was laying kinder under his side, under the back seat. The fire extinguisher was attached to his car the afternoon before; it was on the right-hand side under the front part; I mentioned something to him about it that he had a fire extinguisher in there, and he told me he had it put in there the day before. . . . I noticed the hood of the burned car, the hood on the right-hand side was up and left back when I got there. I noticed the gas line from the vacuum tank to the carburetor had been broken off, or was not connected. This truck track that had been along there the tread looked to be what they call a diamond tread. If I am not mistaken, the car track and the truck track were the same tread, only the truck tracks were larger than the automobile. . . . I sent a couple of men around there to look about the surroundings and they found a half-gallon jar, it was 25 steps from the side of the automobile laying between two pines. It had the odor of gas in it."
N. B. Evans testified, in part: "I observed the tread and approximate size of the track. I have seen Mr. Casey's truck since that time. We got his truck about 12 miles from here. The tires on his truck are the diamond heavy tread Goodyear, exactly similar to the tracks we had tracked out. Two of his tires are worn and the other two are practically new, and this ground was soft and it made a perfect impression. The road that goes through from the Neuse road, this woods path that goes by where the car was burned, there was signs where the truck had backed practically across the road off of an incline, you could see the impression just as clear as a car could make. . . . I also observed tracks of the burned car. When I got there most of these tracks had been put out, but there was a smaller tread tire altogether from the truck track, but it was also a diamond tread, only one track was larger than the other. You could see where that car was out in the soft dirt backing in the woods off of this little by-road. I would say the burned car was 10 or 12 feet from the road, the front end of the car, was not over 10 feet from the side road. It was backed off in about a 45 degree angle toward the road. . . . When I was talking to Mr. Casey at the scene of the fire on 4 July he was very nervous, it was noticeable. . . . Mr. Casey said he lived in Greene County at Mrs. Bradley's. I later went to the Bradley home, I think it was on 9 or 11 July, I am not positive which day. I found this pistol that has been shown here in court at the Bradley home. (Shows witness pistol.) This is the pistol I got at the Bradley home. When I found the pistol two chambers of the pistol had been freshly fired. (Defendant objects to witness testifying as to the condition of the pistol; overruled and defendant excepts.) *Page 200 
There were some loaded cartridges in the pistol. Two of the chambers had been recently fired, fresh powder burns (witness indicates by use of pistol the freshly fired chambers). I took a piece of paper in the presence of Mr. Garner, the coroner, and run through the barrel and it showed fresh powder, damp, showing that it had been freshly fired."
T. G. Sutton testified, in part, in corroboration, and stated what Wood said about defendant Casey killing Causey, in substance what Wood stated in his testimony. "After Wood finished making that statement somebody asked Casey if he had anything to say and Casey said, `No, I guess he told it about right.' . . . I took Wood around this route that he said he and Casey went that Thursday; we made two or three trips. . . . We followed the route that he pointed out. . . . He showed us about where both cars stopped and where he picked the man up and told us how he picked him up and put him back in the car and set the car afire."
F. A. Garner, coroner of Lenoir County, testified, in part: Got to the burned car about 9:00 or 9:30, 4 July. "I first looked in the car to see what was in there. There was part of a person in there, the back bone, skull and bony parts were there. It was on the back seat of the car in the left-hand corner, face down. The head and shoulders were on the back springs, the head was up in the left-hand corner, looked like it was mashed down in there and the other part of the body was down between where the frames of seat were. Everything about the car that would burn was burned. The right-hand hood of the car was raised and the gas line was disconnected. The wheels of the car were burned and the gas tank flat on the ground. I examined the glass hangers that run the glass up and down and the front ones were down and rear ones were up. I examined further and found some car tracks, a small one practically the size the Hudson car would make and a larger track. The small tire tracks looked to be Goodyear heavy tread tires, I have some just like them. The other was a diamond tread, larger than the other. The Hudson tire had not crossed the railroad, looked like it drove up to the railroad, within four or five feet and then backed back, and in backing back the wheels kinder wobbled, was the reason you could see the tread so plain, and in some places the big tire treads had passed over the other track. . . . The first thing I found there was this 25 automatic pistol. I found that in about 15 feet to the right in front of the car. Mr. Dunbar pointed the pistol out to me, it was partly covered by dirt a part of the barrel was sticking out. . . . At Bradley's there is a room that comes out even with the edge of the front porch on the right. We got this out of the right-hand room in a dresser drawer. Wood stated to us that Casey went in the right-hand room *Page 201 
when he went there. That is the same room we found the pistol in. I examined the pistol. Q. Did you make any test with the pistol, and if so, what? (Defendant objects; overruled; exception.) A. I examined it and there were three or four cartridges in there that had been snapped on and two of the chambers showed that it had recently been fired. The barrel showed that it had been recently shot. I ran a piece of paper through the barrel and got freshly burned powder on it. (Defendant objects; objection overruled; defendant excepts to answer.) . . . Two empty cartridges that fitted this 25 automatic were found on the ground. Some were found in the car that showed they had exploded from the heat of the car. There were no empty cartridges in this 25 pistol. I picked up an empty cartridge up near the railroad. Near the railroad on the side of the railroad showed there had been a good deal of stamping there, that was in that condition when I got there. There was evidence where there had been some walking around near the railroad; I would not say whether walking or scuffling it showed tracks there. . . . Q. I ask you if it was not stated to you there on the scene that this was Mr. Causey's pistol? A. Mr. Dunbar stated that he thought it was Mr. Causey's pistol."
Causey weighed 168 pounds.
The defendant, Herman Casey, denied that he killed James C. Causey. Denied all the material allegations of the State, and testified, in part: "I have never made any threats against Mr. Causey or against any one employed by the Atlas Plywood Company, or any other Lumber Company. I have never owned a pistol and did not have a pistol with me on 3 July. I did not see a pistol out where the burned car was on Friday, 4 July. I have never carried a pistol and have never shot a pistol in my life. . . . I did not fight the fire out around the car; I did not attempt to put out any fire. . . . There was not any blood on my shirt when I went over to the Bradleys' that Thursday. . . . Mr. Graham did not tell me anything about Mr. Causey being in charge of the logging operations. I have seen Mr. Causey three times; I saw him at Wallace several years ago off at a distance, 15 or 16 years ago. I saw him in Neuse River low grounds in February, but I did not speak to him and the day I was in Goldsboro I saw him pass the office. Those are the only three times I have ever seen him in my life." The defendant further testified: "I left the river road. I then went to the Greenville fork and bought five gallons of gas; from there I went over in Greene County to Mr. Levy Bradley's house. I stayed at Mr. Bradley's sometimes when I did not have any work to do. I would go there and stay a week, his folks had been doing my washing and they had some of my clothes there. . . . I got to Levy Bradley's house and took *Page 202 
a bath and put on clean clothes. . . . I imagine we got to Mrs. Bradley's about 2:30. I had not eaten any dinner. . . . I ate dinner at Mrs. Bradley's. . . . I went to the Bradley's once or twice a month. I spent the night there on Sunday night before 3 July."
Wm. Lang, a witness for defendant, who was in jail with Wood, testified, in part: "Then I went to sleep and about 12 o'clock I woke up and Wood was lying there smoking a cigarette and I got up and lit me one and I said `Boy did you burn that man up?' and he said `No' but that fellow Casey did it, he said he was sitting on the truck and after he shot him twice then he backed his car back in the woods and drawed gas out of the car and poured it on him and set him on fire and that he come back to the truck and said `I am good will to kill you,' and that he begged him not to kill him. Then on Friday night there came two gentlemen over to the jail and on Saturday morning Mr. Barnes put me across the cell to the window where I could get air and my window and Wood's both come out so we could see and talk to each other. Wood told me `I have been lying on that man.' He said `When me and Casey came through that woods that car was burning up.' Before Wood said that I asked him when his trial was coming off and he said Tuesday of next week. Then he said `I have been lying on Casey, he did not kill that man and burn him up; when me and Casey came through that woods that car was burning.'"
There was other testimony offered to contradict Wood. Four witnesses testified that the general reputation of Herman Casey was bad. Three persons testified to the general reputation of Milton Wood as being good. Fifteen witnesses testified to the general reputation of the defendant, Herman Casey, as being good and four testified to the general reputation of Milton Wood as being bad.
Ruffin Carr testified, in part: "I live in Greene County. I have seen the pistol that was shown here in court at a distance. (Shows witness gun.) This is my gun. The last time I saw this gun was the first or second Sunday in April, Mrs. Mollie Bradley came to my house to borrow it, said somebody was stealing her chickens, and I let her have my pistol. It had .32-long cartridges in it when I loaned it to her. There were four old cartridges and two new ones in the gun. I would not say whether any of them had been snapped or not, but the gun would snap. I had fired the gun on Wednesday night before I let her have it; I shot a dog in the house."
The defendant made numerous exceptions and assignments of error. The contentions of the defendant will be considered in the opinion, and other necessary facts. *Page 203 
The record contains 236 pages. It took a week to try the case and seven counsel for the State and defendant argued the case to the jury. In so important a case, involving life and death, we have set forth the evidence at length. The evidence was direct, the testimony of Milton Wood and circumstantial evidence was sufficient to be submitted to the jury. Our province is alone to determine — "The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference," etc. Art. IV, sec. 8, Const. of N.C.
In S. v. Lawrence, 196 N.C. at p. 564, it is written: " `An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence, does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' S. v. Earp,ante, at p. 166. See S. v. Carlson, 171 N.C. 818; S. v. Sigmon,190 N.C. 684. The evidence favorable alone to the State is considered — defendant's evidence is discarded. S. v. Utley, 126 N.C. 997. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury. S. v. Utley,supra; S. v. Blackwelder, 182 N.C. 899."
The first contention of defendant is in regard to the admission of certain evidence, over defendant's objection, of the testimony of several witnesses concerning statements which the defendant is alleged to have made shortly prior to the date of the alleged homicide, and none of which it is contended were in anywise directed toward the deceased, James C. Causey. This evidence was offered by the State for the purpose of showing motive, malice, premeditation and deliberation.
"It is never indispensable to a conviction that a motive for the commission of the crime should appear. But when the State, as in this case, has to rely upon circumstantial evidence to establish the guilt of the defendant, it is not only competent, but often very important, in strengthening the evidence for the prosecution, to show a motive for committing the crime." S. v. Green, 92 N.C. at p. 782; S. v. Stratford,149 N.C. 483; S. v. Wilkins, 158 N.C. 603; S. v. Lawrence, 196 N.C. at p. 565.
It is true that the threats were not in so many words made by defendant Casey against the dead man Causey, but circumstantial. What is the setting? The defendant Casey was hauling some hogshead stave *Page 204 
timber, shortly before the homicide, off the land of one John H. Sutton. The company, Atlas Plywood Corporation, contended the land the timber was hauled off of belonged to it and not Sutton. Some four weeks before 3 July, the day Causey and the car were burned, Casey sold some of the timber to the Goldsboro Lumber Company at Dover, N.C. amounting to some $28.75. The Atlas Plywood Corporation stopped payment. This embarrassed Casey in paying those working for him. On the day of the alleged homicide he was trying to get the money from the Goldsboro Lumber Company, claiming a bond had been executed for the timber. About 1 June, after the Goldsboro Lumber Company stopped payment on account of notice given it by the Atlas Plywood Corporation, claiming the timber belonged to it, defendant Casey saw one Graham, manager of the company, and he refused to permit Casey to be paid, and Casey said "I am going to have my money, somebody is going to pay me." Casey was told at the time that Causey had charge of the logging operations. In June Casey was hauling a load to Dover in a truck from Sutton's place, a car was standing at the bridge, the man was driving a large car and got out of the car and asked if he was Mr. Casey and where he was getting his timber from. Casey told him from Mr. John H. Sutton's. The car was from Goldsboro and he showed Casey a map. "Don't get any more timber out of that piece of woods down there and do not cut any more out of there." Casey then moved over to the Tilgham tract of land. "That night we came to town, he paid us but not all." Casey's talk was that "This man owed him this money at Goldsboro where he went to see, and the way he talked said the G__ d___ son of a bitch, he was going down there, said wherever he met this G__ d___ son of a bitch, he was going down with him." Several witnesses testified shortly before 3 July that he said substantially "That he would rather be laying flat of his back in the sunshine with his toes bound together than for anybody to beat him out of his labor." Another witness testified that Casey said "Damn if he did not aim to have it on some terms."
Taking all the statements, we think it was some evidence to go to the jury. These vivid expressions indicated that defendant was harboring a grudge against those who had stopped payment of the $28.75 worth of timber gotten from the John H. Sutton place and also stopping him from hauling any more.
Henry West, who lived about a mile and a half from where the car was burned, saw Causey on 3 July driving a Hudson car about 11:30 o'clock, going in the direction of where the car was burned. He saw smoke in the direction about 12:00 o'clock of where the car was burned. "When I saw the car it had the appearance of having been backed *Page 205 
off of the woods path, just a cut short and backed off in the woods to the best of my recollection about 8 feet or 10 feet from the path. The car was badly burned up. Yes, I noticed that a right good little area had been burned over there; I would say a half acre or possibly more. When I saw the car I noticed that the right hood of the engine was raised and the gas line to the carburetor was disconnected. The right-hand hood over the engine, the side the carburetor was on was open.
James C. Causey, on Thursday, 3 July, passed Decatur Nobles' house driving a Hudson coach, between 11:00 and 11:30, going towards Oak Bridge, the scene of the place where he and the car were found burned. About half hour after Causey passed in the car Nobles saw the smoke about 12:00 o'clock. Jerry Sutton saw Causey driving the Hudson coach, the same car he had been driving since he had been coming down there. This was about 11:20 or 11:30 when Causey passed.
The testimony of numerous witnesses was to the effect that the defendant Casey had a grudge and had made threats against the man in the Atlas Plywood Corporation who was responsible for stopping the Goldsboro Lumber Company at Dover, N.C. from paying him the $28.75 and stopping him from getting any more timber off the Sutton place. Graham had told Casey that Causey had charge of the logging operations. What happened is now told by Milton Wood: "I got up with defendant Casey at Sam Smith's house. . . . After he turned off on this road he drove down a mile or more down to a little by road, after a while he came to a little small piece of woods, and I asked him where he was going, and he said he was going down through the islands. After a little while he got to a railroad, and I looked up ahead of me just before we got to the railroad and saw this big car coming. Mr. Casey drove up to the foot of the railroad and stopped his truck and got on the ground and by that time, Mr. Causey in the car ahead of us had stopped his car. The railroad was between them and Mr. Causey could not pass this truck. Mr. Casey was already on the ground, and he walked around on the right-hand side of Mr. Causey's car, and Mr. Causey and Mr. Casey had not said a word, and Mr. Casey reached in his pocket and got a black looking pistol from his pocket. I could not swear as to the pistol. (Shows witness pistol.) This looks like the pistol. I remember this little place here on the side of it. He had it about this close to my face (indicating). Mr. Casey took his pistol out and shot Mr. Causey twice and Mr. Causey's head fell backwards, and after he was dead he (Casey) come back to the truck where I was and he told me if I told it he would kill me if I was the last one on God's earth, and I told him I would not tell it, and he put his pistol back in his pocket and went back to the car and opened the car and got Mr. *Page 206 
Causey around the shoulders and dragged him on the ground and got down kinder on his knees and searched all his pockets and pulled some money out of his right-hand pants pocket; I don't know how much money he got; I saw money sticking out the edge of his hand, it was paper money. He pulled him out the right-hand side of the car. At that place it is little fine old dead looking grass along down where he pulled him out. It was right on the edge of the road, right at the edge of the car. After he pulled him out and searched him and got what he wanted off of him, he took him up in his arms and after two or three lunges he got him back in the car. He got him in the back seat, but what position he laid him in the back seat I could not see; he got in the car and backed it off in the woods and come back to the car and got a pint bottle and he goes back behind the car and then comes to the right-hand side of the car and raises the hood up, and when he gets up he has a pint bottle of gas and he opens the door of the car and poured over half of the gas on Mr. Causey and strikes a match to him and the fire blazes up and the rest of the gas he poured on the car and struck a match to that; and he came back to the car and got up in the truck and drove back down the road. . . . Later Casey came back, stopped and broke a little sweet gum bush and put out some fire around the car."
These threats to show motive, malice, premeditation and deliberation, were admissible in evidence — the probative force was for the jury.
"A threat to kill or injure someone, not definitely designated, is admissible in evidence, when other facts adduced give individuation to it so that as it is generally held, the jury may infer that they were against deceased; but there is authority requiring it to appear to a reasonable certainty that defendant directed the threat against deceased, and holding, if the evidence leaves that matter in doubt, that the doubt must be resolved in defendant's favor and the threat excluded," etc. 30 C. J., part sec. 417, at p. 190. Sec. 418: "Threats made by defendant against a class to which deceased belonged, and prima facie referable to deceased, although his name is not mentioned, are admissible against defendant. Thus threats against policemen, persons of a certain nationality, the members of the family, or any person visiting a certain woman, are admissible, where deceased was a member of the class referred to." S. v. Wishon, 198 N.C. 762.
The second contention of defendant is in regard to the admission of certain evidence over defendant's objection, offered by the State, concerning the condition of the pistol found by the officers at Bradley's home, in Greene County, in the room in which the defendant Casey took a bath. We must get the setting again, and see how far Wood's *Page 207 
testimony is corroborated. Milton Wood testified that defendant Casey "Took his pistol out and shot Mr. Causey twice." A fisherman had heard two shots in the direction of the burned car, the time between 10 o'clock and 12 o'clock on 3 July. Now let us consider how far the testimony of Wood is corroborated by the evidence of others: (1) The two shots heard by the fisherman as above indicated. (2) The truck Casey was in stopped just before it got to the railroad, and the big car Causey was in stopped on the other side of the railroad. They could not pass each other. Witnesses testified to the tracks of the two cars indicating this. Casey got out of the truck and walked around on the right-hand side of Causey's car, reached in his pocket and got a black looking pistol from his pocket. Wood identified it: "I remember this little piece here on the side of it. "Casey had had the pistol close to Wood's face. Casey shot Causey in the head twice and his head fell backward, and Casey then came to the truck and threatened Wood. Casey put the pistol back in his pocket. Wood described how Casey took Causey out of the car and put him back. Perhaps the mysterious pistol found near the burned car was Causey's and fell out of his pocket when Casey took him out of the car and searched him and dragged him. Casey "got in the car and backed it off into the woods." The tracks of the car backed was shown on the ground and testified to by all the witnesses, thus corroborating Wood. (3) Casey got a pint bottle and then went behind Causey's car and then went "to the right-hand side of the car and raised the hood up" gets "a pint bottle of gas," which he poured one-half on Causey and the rest on the car, strikes a match and sets it afire. The testimony of Jasper Tyree and other witnesses was to the effect that the right-hand side of the hood of the car was raised and the pipe that goes from the vacuum tank to the carburetor was disconnected and a pair of pliers were on the running board. (4) Casey leaves the scene of the burning car, but comes back to the burning car "stopped and broke a little sweet gum bush and put out some fire around the car." Decatur Nobles testified: He was present the morning of 4 July at the burned car. "I saw some bushes right side of the car; it looked like it had been beaten out with a brush or something of that sort." Other witnesses testified to the same effect. No doubt the testimony of witnesses as to the time Casey was seen can be reconciled as he was at the car twice. Casey himself told numerous witnesses and Jasper Tyree, the morning of 4 July, when they were at the car "I was at this car yesterday right around 12 o'clock." (5) One Turner picked up a key in the path, sort of in front of the car where Casey had not been that morning. Casey walked up and said it was his key. Casey said it was his truck key and he had dropped it out of his pocket that had a hole in it. Jasper Tyree asked Casey to let him ride in the truck with him when *Page 208 
Casey was leaving the morning of 4 July. Tyree testified that he did not use the key that was found to start his truck. "The key was in the switch when he got to the truck. He did not take the key out of his pocket after he left the scene of the fire that day." Tyree rode back to his filling station with him. Tyree testified "Mr. Casey was in a nervous condition; he was not a normal man; he was nervous and trembling."
Casey was boarding at Mrs. Beddard's; stayed there the night of 2 July, and on the morning of 3 July she fixed breakfast for him. She expected him back and fixed dinner for him, but he did not come for it. Nor did he spend the night of 3 July there. He went to the Bradley's and ate there. Wood testified that Casey "did not get a drop of blood on him except a little spot on one of his sleeves." Wood and Casey, according to Wood's testimony, after the second trip to the burning car, went down the Greenville Highway and turned off to the left and went five or six miles to the Bradley home, where Casey had his washing done. Casey went in the room, took a bath and when he came out "he had on a clean shirt." Casey told Evans he lived at the Bradley's. Evans testified, and his testimony was corroborated by others: "I later went to the Bradley home. I think it was on the 9th or 11th of July; I am not positive which day. I found this pistol that has been shown here in court at the Bradley home (shows witness pistol). This is the pistol I got at the Bradley home. When I found the pistol two chambers of the pistol had been freshly fired. There were some loaded cartridges in the pistol. Two of the chambers had been recently fired, fresh powder burns (witness indicates by use of pistol the freshly fired chambers). I took a piece of paper, in the presence of Mr. Garner, the coroner, and run through the barrel and it showed fresh powder, damp, showing that it had been freshly fired."
We think this evidence in regard to the pistol a circumstance with the other evidence, as above set forth, to go to the jury — the probative force was for them to determine.
We think there is nothing in the third contention. There was sufficient evidence on the part of the State to justify the jury in finding that the deceased came to his death as a result of the wounds inflicted by the accused.
The fourth contention is in regard to the failure of the court below to submit to the consideration of the jury the element of manslaughter. There is no evidence of manslaughter on this record. There are no facts on this record from the testimony of Wood or defendant Casey that would justify the court to submit to the jury the contention of defendant "that a fight ensued upon a chance meeting between the deceased and the accused, in which the accused lost his life." The *Page 209 
defendant, who was a witness in his own behalf, never made any such contention in his testimony; nor did Wood or any witness in the case. The pistol found could have dropped from Causey's pocket when he was dragged out of the car and the "stamping" from defendant Casey handling a heavy man weighing some 168 pounds.
It is well settled that where the evidence is sufficient to justify a charge on the aspect of manslaughter, it is the duty of the court to give it, and if this is not done it will be held for error.
"In S. v. Johnson, 161 N.C. 264, there was no error in the charge as given, and it was held, Associate Justice Brown delivering the opinion: `That there was not a scintilla of evidence upon which a verdict of manslaughter could have been based.' In S. v. Teachey, 138 N.C. 598, the same ruling was made: `That no element of manslaughter was presented.' And on the facts in evidence the same position seems to be fully justified inS. v. Bowman, 152 N.C. 817. See S. v. Chavis, 80 N.C. 353." S. v.Merrick, 171 N.C. at p. 794-5; S. v. Ashburn, 187 N.C. at p. 725; S. v.Hardee, 192 N.C. 533.
The fifth contention of defendant is in regard to the failure of the court to declare and define the law of alibi, and give the contentions of the defendant arising thereon from the evidence.
The defendant contends that from the entire charge there is not a place in it where the word "alibi" is used. This may be so, but the court gave in the charge the testimony of defendant and the material witness in reference to the time of day Casey claimed he was at the burning car on 3 July, and fully set forth this contention of defendant and his witnesses that he got on the scene after the car was burning and at an hour of the day when he could not have committed the crime. The court below fully charged in regard to reasonable doubt. We can see nothing that could prejudice the defendant by not calling it "alibi." The jury in the charge were given all the evidence bearing on this aspect, and from the charge we see no prejudicial error.
In S. v. Steadman, 200 N.C. 768, this Court said: "The court below fully set forth the facts and contentions in the charge as to the alibi set up by defendants. S. v. Melton, 187 N.C. 481."
We can see no evidence that would class Milton Wood as an accomplice of the defendant Casey. No instruction was prayed for by defendant Casey on this aspect, but in this jurisdiction the unsupported evidence of an accomplice, if believed by the jury, is sufficient to convict. See S. v.Ashburn, supra.
It seems that while this appeal was pending in this Court the defendant's counsel made a motion for mistrial, because certain of the jurors were alleged to have been prejudiced, and for a new trial for newly discovered evidence, before Judge G. V. Cowper. He refused both *Page 210 
motions and put his refusal distinctly on the ground that he did not have jurisdiction to deal with the motion. The appeal bond has been given in the instant case. The effect of this was to stay all proceedings in the court below until the appeal has been heard here. C. S., 4654. This is particularly true since the enactment of chapter 55, Public Laws 1925, the effect of that being to transfer the execution against the body of the defendant to the Supreme Court. The whole record being in the Supreme Court, then, for all purposes, the motions made before Judge Cowper werecoram non judice.
This case presents a sad tragedy. The evidence was to the effect that defendant Casey was obsessed — "nursing his wrath to keep it warm" — with a wrong he felt had been done him by the Atlas Plywood Corporation, or by Causey working for the Atlas Plywood Corporation, representing the corporation in its logging operations in the woods, in stopping the payment of a timber bill of Casey's — the timber claimed to have come off the corporation's land, and stopping the removal of any more timber off the land which was also claimed by Sutton. The evidence is all to the effect that the defendant Casey, in cutting and selling the timber acted in good faith, as he cut it off land claimed by another. Unfortunately, Casey, driving a Chevrolet truck, meets Causey driving a Hudson coach in the forest. The cars and actors in the tragedy face each other. Revenge was in the heart of defendant Casey, and instead of appealing to the law of his land, he applied the law of the jungle. He shot and killed Causey, and, no doubt seeking payment for his timber, pulled him out of his car, took some money out of his pocket, and then put his body back in the car, put gasoline on his body and the car and burned Causey and the car up. The body of Causey was so burned that it could not be identified, but many of his personal effects were found, among them was a band ring and the inscription on the inside was as follows: "M. W. C. to J. C. C., Decr. 27, 1900." That was the date of his wedding. All these years he had carried this memento. The evidence all indicates that he was an industrious man of high character, and he left a widow and children. He has suffered a horrible death for this unfortunate controversy. Casey has been convicted by a jury of his countrymen of murder in the first degree, which carries with it the penalty of death. He also left children.
From a thorough examination of a long record, in law we can find
No error. *Page 211