STATE v. TEACHEY.

(Filed March 21, 1905.)

*Homicide—Challenge to Array—County Commissioners— Revision of Jury Lists—Challenge to Juror—Dying Declarations—Refreshing Recollection—Premeditation and Deliberation—Evidence.*

1. Where at August Term, 1904, the prisoner's challenge to the array was sustained because of irregularities in revising the jury lists in 1903, and in consequence of such ruling, the commissioners revised the jury lists anew in September, 1904, destroying all the old scrolls remaining in the boxes and made an entirely new jury list for the county, composed of all citizens of good moral character and otherwise qualified as jurors and placed their names in box No. 1, and at their meeting in October, 1904, the 18 jurors required for the second week of the October Term were regularly drawn: *Held*, that the prisoner's challenge to the array of said regular jurors, on the ground that the commissioners destroyed all the old scrolls remaining in the boxes which contained the names of the persons eligible as jurors, was properly overruled.

2. While it is the duty of the county commissioners to draw the jury and revise the jury lists at the time and place the law directs, yet if these things are not so done, but are properly done at another time and place, they will be treated as irregularities, not vitiating their action, for these provisions of the statute are directory and not mandatory.

3. An exception relating to a challenge to a juror, is without merit, where the juror was stood aside for cause, or the prisoner did not exhaust his peremptory challenges.

4. In an indictment for homicide, declarations of the deceased that the prisoner shot him and detailing the particulars of the shooting, are competent as dying declarations, where the statements show that deceased knew he was *in extremis* and in the shadow of death.

5. Where the homicide was committed at the house of a woman whom the prisoner visited, a declaration by the prisoner that he would kill any man who came around "his woman's house" was competent as tending to show motive and malice.

6. In an indictment for homicide, a witness may refresh his recollection as to dying declarations of the deceased from an affidavit made by deceased in the presence of witness, the court telling the jury that the affidavit was not in any sense evidence to be considered by them.

7. Since the Act of 1893, dividing murder into two degrees, if the killing is admitted, or established beyond a reasonable doubt, the prisoner must justify it or excuse it, or he is guilty of murder in the second degree.

8. In order to convict of murder in the first degree, the burden is upon the State not only to establish the killing beyond a reasonable doubt, but likewise to prove that it was done premeditatedly and deliberately, or by lying in wait, poison or starvation.

9. Where the prisoner was convicted of murder in the first degree, the failure of the court to charge the jury on the question of manslaughter was not prejudicial to him, and besides, in this case, there was no element of manslaughter.

10. An instruction that if "the prisoner weighed the purpose of killing long enough to form a fixed design to kill and at a subsequent time, no matter how soon or how remote, put it into execution and killed the deceased in pursuance of such fixed design, then there was sufficient premeditation and deliberation to warrant finding him guilty of murder in the first degree" was proper.

INDICTMENT against Dan Teachey, heard by *Judge Fred Moore* and a jury, at the October Term, 1904, of the Superior Court of DUPLIN County.

The prisoner, Dan Teachey, was tried at August Term, 1903, for the murder of one Rivenbark in the County of Duplin. The grand jury which indicted him was drawn prior to a revision of the jury boxes on the first Monday in June, 1903. He was tried and convicted of murder in the first degree at August Term, 1903, and appealed to the Supreme Court. A new trial was ordered for error in reception of evidence. At August Term, 1904, the cause came on to be heard again. So far as the record discloses no plea in abate-

ment was filed, or motion made to quash the bill for irregularity in selecting the grand jury or other cause.

At said term the prisoner challenged the array of jurors for irregularities in revising the jury lists and boxes, which motion was sustained.

At October Term, 1904, the cause was tried, commencing second week, November 7, before *Moore, J.,* and a jury. The prisoner was convicted of murder in the first degree and from the judgment pronounced appealed to this court.

*Robert D. Gilmer, Attorney-General,* and *Stevens, Beasley & Weeks* for the State.

*James O. Carr* and *Kerr & Gavin* for the prisoner.

BROWN, J.   The prisoner again challenged the array of regular jurors summoned for the second week, as well as the array of special veniremen.   From a very full and complete finding of facts upon the hearing of such challenge we condense the following: At August Term, 1904, the challenge to the array was sustained because of irregularities in the revision of the jury boxes prior to the drawing of the jurors at the June, 1903, meeting of the commissioners of the county.   In consequence of such ruling of the court, the commissioners revised the jury lists anew on the first Monday in September, 1904.   All names in boxes 1 and 2 were revised and destroyed.   The board then caused to be laid before them the tax lists for 1903 and from those lists selected the names of such persons as had paid taxes and were of good moral character and sufficient intelligence, and also they selected such other citizens of the county as did not appear on the tax lists, but who were legally eligible and qualified to serve as jurors.   The names thus selected were declared to be the jury list for the county and were placed by the commissioners in box No. 1.   At the time of the destruction of

the scrolls mentioned there were in the boxes the names of persons eligible for jury duty.

The effect of this revision of course was to provide an entirely new jury list for the county composed of all the citizens of the county of good moral character and otherwise qualified as jurors. On the first Monday in October, 1904, the 36 regular jurors required for the first week and the, 18 jurors required for the second week of October Term, were drawn in the manner required by law. In drawing these jurors for the first week, the names of those who had served within two years were rejected and placed in box No. 2, but no names whatever were rejected in drawing the eighteen jurors for the second week. The court overruled the challenge to the array and the prisoner excepted. In such ruling we find no error.

In reviewing the action of His Honor, it is uselss to discuss or pass upon the legality of the act of the commissioners at their October session when drawing the jurors for the October Term. Whether they had the right, after a name is drawn out of box No. 1 in due course by the small boy, to return it to box No. 2, instead of placing the name on the list of jurors to be summoned for the court, is immaterial in this case. The fact is found that no name was rejected in drawing the jurors for the second week and that the prisoner's trial began on Monday of that week. The bill of indictment was returned several terms before by a grand Jury drawn in 1903. So the prisoner has not been prejudiced thereby so far as we are able to see.

The action of the board in revising the jury list anew at September Term, 1904, seems to have been rendered necessary, or at least advisable, by reason of the ruling of the court in this case at August Term preceding, upon the prisoner's challenge to the entire panel of jurors, which challenge was sustained and the panel set aside for errors which His Honor thought vitiated the action of the commissioners at

their meeting in June, 1903, in revising the jury lists for the county.

The particular act complained of is that at the September Term, 1904, the board destroyed all the old scrolls remaining in the boxes, and made an entirely new jury list and placed the names in box No. 1. The facts found by the court below show plainly that not only was there no wrongful purpose or intent, but that the commissioners acted with great care, and in a manner indicating a conscientious discharge of their duty. We do not hold that this action of the board was illegal or irregular, but at most it could be no more than the latter. That would not vitiate the list of jurors drawn from the box, and constitute no ground for challenge to the array. The statute is considered directory so far as it relates to the action of the commissioners as to the time and place of drawing the jury and as to revising the jury lists. It is the duty of the commissioners to do these things at the time and place the law directs. But if not so done, but are properly done at another time and place, they will be treated as irregularities. This is necessary to prevent delay in the administration of justice. *Moore v. Guano Co.,* 130 N. C., 229.

Nor do we think that the prisoner can reasonably complain of the act of the commissioners in destroying all the old scrolls in the boxes. He had challenged the panel at August Term, 1904, drawn from those boxes, upon grounds tending to vitiate the contents of the boxes and the action of the commissioners at June Term, 1903, in revising them. This challenge of the prisoner was sustained. The action of the board at September Term, 1904, was eminently proper in view of the ruling of the court.

In recurring to the statutes regulating the revising of jury lists of the county and the drawing of jurors, *Justice Connor,* in *State v. Alfred Daniels,* 134 N. C., 648, says: "It has been held from the earliest period of our judicial history that the provisions of these statutes are directory and not manda-

tory." In this case and in the preceding one of *Moore v. Guano Co.*, the cases are all cited and discussed, which bear at all on this subject. We therefore forbear any further discussion of them. Exception No. 3, relating to challenge to an individual juror is without merit, as the juror was stood aside for cause. Besides, the prisoner did not exhaust his peremptory challenges.

We proceed now to notice such of the prisoner's numerous, exceptions noted during the trial and appearing in the voluminous record, as we deem proper.

The evidence on the part of the State tends to show that the homicide occurred on Wednesday night, March 4, 1903, between eight and nine o'clock, at the house of Gilbert Johnson and Easter Williams, in Duplin County, which house was situated a little more than three miles from the home of Robert Teachey, with whom his son, the prisoner, resided. There were present in the house when the homicide occurred Gilbert Johnson, Annie Johnson, Easter Williams and the four illegitimate children of Easter Williams. The evidence relied on by the State tends to show that the deceased left home a short time after dark and went to the house of Easter Williams for the purpose of securing her services in working his strawberries; that he remained in the house a short time, and after securing her promise to come on the following Monday, turned to leave the house, and after getting out of the door the prisoner approached him from behind the house or from the corner, making threats and using profane language and shot the deceased. After the shooting the deceased went in the direction of the home of J. E. Dixon, who lived about 180 yards from Easter Williams. Before reaching Dixon's house, the deceased fell, and in answer to his cries, Dixon came and found him in great pain, lying on his back in the middle of the road. To this witness the deceased said "I am shot and shot to die," adding "Dan Teachey is the man who shot me; I saw him and caught his

STATE *v.* TEACHEY.

voice." The deceased was then taken to his father's house and died from the effects of his wounds between 5 and 6 o'clock P. M., on Friday following. There was also evidence tending to show the existence of illicit relations between Easter Williams and the prisoner and that he was the father of Easter's youngest child. It also appears in the evidence that some time before the homicide the prisoner said he believed that Bob Rivenbark, the deceased, was going to Easter's house and if he caught him there he would kill him, and that three weeks before the shooting the prisoner said: "I have two good guns and am going to buy another one," adding that "he would kill any man he caught at his woman's house." In his defense the prisoner relied upon an alibi and offered evidence of a number of witnesses tending to prove the alibi.

There are in this record a large number of exceptions by the prisoner to the testimony. We have examined each exception with that care which the importance of the case demands. We are unable to discover any merit whatever in any of them, and therefore we do not deem it necessary to discuss the exceptions to the evidence *seriatim*. As an axample, we cite the exception to a certain part of the testimony of Ann Johnson wherein she testified that the prisoner was in the back yard and asked "how is Rivenbark?" and upon receiving a reply, the prisoner said, "Well, I must leave this place." "The prisoner was standing on the side not far from the oak tree the next morning. The prisoner spoke to Lizzie Williams while standing in the yard. I did not see him give her anything." As the ground of the objection is not stated, we have been unable to discover any possible reason for it. The declarations of the prisoner, several of which were offered in evidence by the State and proved by different witnesses, are plainly competent as evidence tending to prove the commission of the crime. These declarations were made under circumstances clearly indicating that they

138——38

were voluntary, and not made under duress or other improper influence.

The prisoner further objects, in his seventh exception, to the testimony of Ann Johnson in regard to a conversation with Max Myers. The record shows that she testified that "Max Myers was the first person who spoke to me about this occurrence." It is true the prisoner was not present, but the conversation, whatever it may have been, was not given in evidence. The fact that there was such a conversation is immaterial and harmless.

Exceptions 4, 5, 9, 10, 12 and 13 were made to the statements of several witnesses in regard to the dying declarations of the deceased. On the night he was shot, the deceased said to J. E. Dixon and one Booth, witnesses for the State, that "he was shot and wanted to tell us both, while he was in his right mind, who shot him." The deceased then said, "I am shot and shot to die. Dan Teachey is the man who shot me. I saw him and caught his voice." He said he came out of Easter Williams' house and when he got a step or two from it, the prisoner came up from behind the house and said to him, "Bob, what in the devil business have you got here tonight." He said he was going backwards from the prisoner and the prisoner shot him.

J. S. Rivenbark, a witness for the State, testified to being present when the declaration was made by the deceased to Dixon and Booth, and that the deceased further said, "I walked out of the house and the prisoner walked round the house cursing; he said 'by God, these women can get their living without work,' and jerked out his pistol and shot me; that the prisoner followed him and kicked him three or four times, knocked Easter Williams down, and then ran." This witness further testifies that on this occasion the deceased called his mother, put his arms around her and said, "I'm gone. I am going to die. Dan Teachey shot me to death."

The deceased also stated to J. D. Teachey, about 2 o'clock

the same night he was shot, that the prisoner approached him from behind the house, making threats; and he stepped backwards and the prisoner shot him and struck and kicked him; that he heard the prisoner's voice and saw his face. The deceased made a statement in writing which he swore to, but as this statement was not admitted as evidence it is unnecessary to notice it.

Every condition necessary to make the dying declarations of the deceased competent, was shown to exist in this case. The deceased was shot on Wednesday night and died on Friday night following. The statements show conclusively that he knew he was *in extremis* and in the shadow of death. He told the physician that he was going to die, and made the same statement to his mother. The declarations under such circumstances were not only competent, but they were plain, unequivocal, and of no uncertain meaning. The ruling of the court in admitting them is sustained by the uniform decisions of this court. *State v. Dixon,* 131 N. C., 808; *State v. Boggan,* 133 N. C., 761. Although a large part of the exceptions in the record do not point out that portion of the testimony which is obnoxious, as required under the ruling in *State v. Ledford,* 133 N. C., 714, yet in the interest of human life we have examined all the testimony with great care, and we are unable to see wherein the prisoner has just ground of exception to any ruling of His Honor disclosed in the record.

Exception is taken to the testimony of Max Myers and a number of other witnesses offered by the State as corroborative evidence only. The record shows that His Honor carefully explained, at the time of the introduction of the evidence, the purpose for which it was offered, and fully complied with the recent rule of this court upon that subject. In addition, he called the attention of the jury in his charge to corroborative evidence in general, and impressed upon

them their duty to give it only that effect and weight which its character deserved.

The testimony of McClung was competent as tending to show motive and malice. It was a declaration of the prisoner tending to show a premeditated and deliberate purpose to "kill any man who came around his woman's house," and it appears from the testimony that the homicide was committed at the house of the woman whom the prisoner visited.

The charge of His Honor is very full and clear, and in it all the rights of the prisoner seem to have been most carefully guarded, and the testimony and contentions in his behalf presented to the jury along with the State's with eminent fairness and ability. We do not deem it necessary to comment at length upon all of the exceptions to the charge.

The prisoner excepts because the court referred to the affidavit of the deceased, made before J. D. Teachey, a Justice of the Peace. This paper was permitted to be used by one or two of the witnesses, present at the time it was taken, for the purpose of refreshing their memory. His Honor was careful to call the attention of the jury to the fact that this paper was not in any sense evidence to be considered by them; that the law does not authorize the taking of an affidavit or deposition of a person mortally wounded, but the law does permit the dying declarations of the person who has been slain by another to be given in evidence before the jury. He told them further that the fact that the deceased swore to this paper is of no importance; that the only evidence the jury should consider of these dying declarations is the evidence of the witnesses who testified to them and that they were made in their presence, and that the only use which could be made of this paper is the use made of it by the witnesses, Graham and Teachey, who were permitted to refer to it for the purpose of refreshing their recollection, as the affidavit was made in their presence and taken by them. It has been expressly decided in a number of cases that a

witness may refresh his recollection as to dying declarations of the deceased from memoranda. *State v. Whitson,* 111 N. C., 695; *State v. Finley,* 118 N. C., 1161; *State v. Craine,* 120 N. C., 601.

The court further instructed the jury that "if you are satisfied beyond a reasonable doubt from the evidence in this case that the prisoner, Dan Teachey, shot W. Robert Rivenbark, with a gun or pistol, on the 4th day of March, 1903, and that Rivenbark died from the wound thus inflicted on the 6th day of March, 1903, then the prisoner is guilty of murder in the second degree at least." It is the settled law in this State that, when the killing is admitted or established beyond a reasonable doubt to have been done by the prisoner, the burden is upon the prisoner to either justify or excuse the killing. If he fails to do so he is guilty of murder. The Act of 1893 has introduced a new element into the crime of murder and divided it into two degrees. Since the passage of that act if the killing is admitted or established beyond a reasonable doubt, the prisoner must justify it or excuse it, or he is guilty of murder in the second degree. In order to convict of murder in the first degree, the burden is still upon the State not only to establish the killing beyond a reasonable doubt, but likewise to prove that it was done premeditatedly and deliberately, or by lying in wait, poison or starvation. In this case the prisoner denied the killing and undertook to establish an alibi. Therefore the burden was upon the State to prove the killing beyond a reasonable doubt, and, to justify a verdict of murder in the first degree, to prove premeditation and deliberation as well. The charge of the court below was entirely correct and in line with all the authorities.

The prisoner excepts because the court failed to present to the jury in this connection a view of manslaughter. The prisoner was convicted of murder in the first degree, and we do not see how it was prejudicial to him because His Honor

failed to charge the jury on the question of manslaughter. *State v. Munn,* 134 N. C., 680 ; *State v. Lipscomb, Ibid.* 689. In this case there is no element of manslaughter. The testimony of Gilbert Johnson and Ann Johnson, State's witnesses, pointed out to us by the prisoner's counsel as supporting a view of manslaughter, fails entirely to justify any such charge.

The refusal to give certain special instructions asked by the prisoner constitutes exceptions 13, 14, 15, 16, 17, 18 and 19. We do not think there was any evidence to sustain them, and they were properly refused.

In regard to the exceptions relating to lying in wait, an examination of His Honor's charge shows that he expressly told the jury that there was no evidence in the case sufficient to justify the jury in finding that the prisoner was lying in wait.

The court charged the jury: "If you are satisfied beyond a reasonable doubt that the prisoner killed the deceased and that the killing was wilful, deliberate and premeditated, you should convict the prisoner of murder in the first degree. If you are satisfied beyond a reasonable doubt that the prisoner weighed the purpose of killing long enough to form a fixed design to kill, and at a subsequent time, no matter how soon or how remote, put it into execution, and killed the deceased in pursuance of such fixed design to kill, ·then there was sufficient premeditation and deliberation to warrant you in finding the prisoner guilty of murder in the first degree." We are unable to see any error in this instruction. When the purpose or design to kill is formed with deliberation and premeditation, it is not necessary that such purpose or design be formed any definite length of time before the killing *State v. Spivey,* 132 N. C., 989.

There is in the record abundant evidence to justify the finding of the jury that the homicide was committed by the prisoner in pursuance of a fixed design deliberately formed

beforehand, and under circumstances attended with heartless brutality. The evidence offered by the prisoner was not intended to show palliation, extenuation or excuse. It was introduced for the sole purpose of establishing an alibi, and it seems to have had little weight with the jury. The prisoner has been tried twice for this crime, and on both trials the jury have pronounced him guilty of the wilful and deliberate murder of Rivenbark. A minute examination of the entire record on the second trial shows that the prisoner was fairly and impartially tried, and that no error was committed of which the prisoner had just ground to complain. There is
No Error.