STATE OF NORTH CAROLINA v. ROGER WAYNE FRANKLIN

No. 417A89

(Filed 26 July 1990)

1. **Homicide § 21.4 (NCI3d)— first degree murder—defendant as perpetrator—sufficiency of evidence**

Evidence that the first degree murder charged in the bill of indictment was committed and that defendant was the perpetrator was sufficient to be submitted to the jury where it tended to show that the victim's body was found at the edge of a path in a field "many weeks" after she died; her tank top was riddled with holes; defendant had the motive and opportunity to kill deceased, as she had allegedly stolen cocaine from him, making him angry, and the victim was last seen alive as she rode off with defendant in his car; defendant sold his car because he knew police would be looking for him

STATE v. FRANKLIN

[327 N.C. 162 (1990)]

in that vehicle; he escaped to Daytona Beach, Florida; defendant told the victim's mother when he telephoned her that he would not be put on hold because he thought the phone was bugged or tapped and he wanted the mother to get the police off his back; and defendant boasted to a fellow inmate that he had killed a girl because she owed him money, had been questioned about it, and had gotten away with it.

**Am Jur 2d, Evidence §§ 1124 et seq.**

2. **Homicide § 21.5 (NCI3d) — body with marks of violence — inculpatory statements to cell mate — sufficiency of evidence of first degree murder**

When a body is found with marks of violence upon it, such evidence establishes corpus delicti, and evidence of corpus delicti coupled with the testimony of a cell mate relating inculpatory statements made by defendant is sufficient to support a conviction.

**Am Jur 2d, Evidence §§ 1141, 1142.**

3. **Homicide § 17.2 (NCI3d) — first degree murder — threats made prior to victim's disappearance — no class threat — admission of evidence prejudicial error**

The trial court in a first degree murder case committed prejudicial error in permitting a witness for the State to testify about threats made by defendant against an unidentified woman approximately three weeks before the victim's disappearance, since defendant's threat that he was going to kill a woman who stole cocaine from him was in no way tied to the victim in that the evidence showed that the victim stole cocaine from defendant only on 17 June, the morning she disappeared, while defendant made the threat to kill the girl three weeks before; furthermore, the threat in question was not admissible as a class threat because it was directed against a specific person.

**Am Jur 2d, Evidence §§ 272, 363.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Hobgood, J.*, at the 24 April 1989 Criminal Session of Superior Court, FRANKLIN County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 16 May 1990.

STATE v. FRANKLIN

[327 N.C. 162 (1990)]

*Lacy H. Thornburg, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Roger W. Smith and Melissa Hill for defendant-appellant.*

MEYER, Justice.

Defendant brings forward seven assignments of error with regard to the guilt-innocence phase of his trial. We have performed an exhaustive review of the record, briefs, and oral arguments of the parties, and we conclude that the trial court committed prejudicial error in permitting a witness for the State to testify about threats made by the defendant against an unidentified woman approximately three weeks before the victim's disappearance that were not demonstrated to be directed against the victim. We hold that this error entitles defendant to a new trial.

On 14 March 1988, defendant was indicted for the first-degree murder of Jean Marie Sherman. Defendant's first trial ended in a mistrial after the jury expressed its inability to reach a unanimous verdict. The case came on for a second trial on 24 April 1989 before Judge Robert H. Hobgood and was tried noncapitally. At the close of the State's case, defendant moved to dismiss the charge of first-degree murder and all lesser included offenses. Judge Hobgood denied the motion. Defendant then offered evidence and renewed his motion to dismiss at the close of all of the evidence. Again, his motion was denied. Presented with the options of guilty of first-degree murder, guilty of second-degree murder, and not guilty, the jury returned a verdict finding defendant guilty of the first-degree murder of Jean Sherman.

The assignments of error brought forward by defendant require this Court to engage in an extensive review of the evidence introduced at trial. For that reason, we endeavor to set out that evidence in some detail.

The State's evidence tended to show the following: In the spring of 1986, the victim, Jean Sherman, lived in a mobile home located near the county line between Wake and Franklin Counties with her fiancé, Travis Kelly, and several members of his family. Around March of that year, Jean became pregnant with Travis' child. Travis' sister-in-law, Janet Kelly, testified that Jean and Travis were very excited about having a baby and that Jean never acted like she did not want to keep the child. In fact, Janet testified

that Jean "wanted that child worse than anything." Yet, on 29 May, Jean underwent an abortion. She told the social worker that her reasons for obtaining an abortion were financial.

Meanwhile, defendant was completing a seven-year sentence for controlled substance violations and was in the custody of the North Carolina Department of Correction. Defendant was released on parole on 14 March 1986 and was given a job at a construction site by a family acquaintance, McLester Turner. On 24 April 1986, defendant was arrested and charged with felonious possession of cocaine. He was released on bond on that same day and returned to Wake County district court on 20 May 1986, where he waived a probable cause hearing.

During the month of May, defendant performed some work for McLester Turner and was paid for those services on 22 May 1986. After this initial work, defendant worked a part of one additional day in May for Turner. Turner testified that defendant arrived for work that morning "highly agitated, angry, mad." Turner talked to defendant in Turner's truck, and defendant told Turner that he was "messed up" and that he wanted Turner to take him for a ride so that he would not be seen in that condition should his parole officer arrive. Turner testified that defendant "was ranting and raving about a b---- that ripped his dope and money off." He stated that he "was going to kill the b---- that ripped him off, he was going to rip her, blow her d---- brains out, cut her." Turner further testified that defendant stated that the woman either stole $300.00 in drugs and $800.00 in cash, or vice versa.

Later that day, a woman arrived at the job site to pick up defendant. She was driving a rust-colored Monte Carlo automobile. Turner asked defendant if this was the woman who had ripped him off. Defendant laughed and said, "no, this was not his fine b----, this was just a slut he was riding around with." Defendant got into the car with the woman and rode away with her. This was the last time defendant worked for Turner.

Turner was unable to recall the exact date upon which the threats were made, but by referring to defendant's last paycheck, he was able to narrow the date of the threat down to a five-day period in May—between the dates of 24 May and 29 May 1986. Turner testified that he paid defendant for this last day of work by check·on 7 June 1986, and he presented the check stub which evidenced that fact. He further testified that defendant's last day

of work, the day of the threat, could have been as long as two weeks before 7 June and was at least a week and a half before 7 June.

The evidence presented does not clearly establish the date upon which defendant and the victim met. Janet Kelly testified that she did not know for sure when Jean and defendant started seeing each other, but to the best of her knowledge, Jean did not start seeing defendant until after her pregnancy was terminated on 29 May. Barbara Rose, Travis' mother, testified during defendant's first trial that the defendant "came by [the mobile home] every two or three weeks to get [Jean]" and that he "had picked Jean up a time or two before the 17th [of June]." This former testimony was utilized by the defense to impeach Mrs. Rose's testimony at the second trial that she did not recall ever having seen defendant before 17 June.

On 16 June 1986, defendant was again arrested for the felony of possessing fourteen grams of cocaine. He was released on bond that same day, and a probable cause hearing was scheduled for 1 July 1986. He did not appear for that hearing.

In the early morning hours of 17 June 1986, Janet Kelly heard a "real noisy car" and a knock on the door. She let Jean into the mobile home. Jean appeared to be intoxicated and was stumbling around and talking with a slur. The two women sat at the kitchen table and talked for about half an hour. Jean told Janet that "she had stolen a large amount of cocaine from a guy named Wayne" that night. Jean stated that she had given the cocaine to a girl named Kim Carnes and that Kim was going to sell it for her. She told Janet that in its uncut state, the cocaine was worth about $1,000. Jean then went to bed, lying down beside Travis on a mattress on the living room floor.

At around 9:30 a.m. on 17 June, Jean woke up and went to the store. When she returned, she told Janet that Wayne was coming over and that she was going to return the cocaine to him. After about an hour, a "candy apple red" car arrived and Jean jumped up, exclaiming, "there's Wayne." Jean went outside to talk to Wayne. She was wearing a black wraparound skirt and a black Harley Davidson tank top. Janet thought the car was a 1969 or early seventies model Chevrolet Nova or Chevelle. Janet later saw Jean and Wayne get into the car and drive away. Barbara Rose also testified that she saw Jean leave the mobile home with defendant on the morning of 17 June. She, too, described his car as

a red Chevelle or Nova and recalled, as did Janet, that Jean was wearing a black skirt and black Harley Davidson tank top. Jean left her belongings, including her purse, at the mobile home. That was the last time she was seen alive.

On 22 June 1986, defendant was arrested for a third time and charged with the felony of possessing twenty-eight grams of cocaine. He was released on bond, and a probable cause hearing was scheduled for 9 July 1986. As was the case with the second arrest, defendant did not appear for the hearing. An order for defendant's arrest for failing to appear on these charges was issued on 11 July 1986.

Jean's mother had an agreement with her daughter that they would keep in touch with each other at least every ten days. Jean visited her mother on 13 June. When Mrs. Sherman did not hear from Jean by 23 June, she went to the mobile home where Jean was living with Travis and his family. She pulled into the driveway, saw someone in the doorway, and honked the horn. Travis came to the car. When Mrs. Sherman asked to speak to Jean, Travis said that she was not there and that he did not know where she was. On 26 June, Mrs. Sherman again returned to the mobile home. Travis then told her that his mother and Janet last saw Jean when she left the house with defendant in his red car.

On 30 June 1986, defendant drove into McLamb's Exxon in Fayetteville complaining that the car had engine trouble. The station attendant diagnosed the problem as being a spun bearing. Defendant stated that he could not afford the repair bill and offered to sell the car to the attendant. McLamb agreed to buy the car, and the two executed a title transfer on the spot.

On 7 July 1986, Mrs. Sherman went to the Franklin County Sheriff's Department and filed a missing person's report on her daughter. Later that summer, Mrs. Sherman visited defendant's mother, and shortly thereafter, she received a telephone call from defendant. She was asleep when he called and asked him to hold on for a moment. Defendant told Mrs. Sherman that "he wasn't going to hold because he thought [she] had the phone bugged or tapped or something" and hung up. Sometime later, he called back. Mrs. Sherman asked defendant if he knew her daughter, and he replied that he did. She asked him to have Jean call her, and defendant explained that Jean was not with him because he had brought her back to the mobile home and left her there. Mrs.

Sherman again asked defendant to have Jean call her, at which time defendant told her "to get the police off his back."

On 19 August 1986, a police officer in Daytona Beach, Florida, saw defendant and recognized him from a description he had received of a man wanted in North Carolina on a narcotics charge. After a prolonged scuffle, a chase, and another scuffle, defendant was subdued and handcuffed.

Later that day, Deborah Bramlett, a Daytona Beach police detective, interviewed defendant at the correctional facility where he was being held pending extradition. She conducted a second interview with defendant on 20 August following a telephone conversation with an officer in another city who informed her of Jean Sherman's disappearance. During that second interview, defendant told Detective Bramlett that he had met Jean Sherman when he picked her up while she was hitchhiking. They had been seeing each other and had engaged in sexual relations. On the morning of 17 June, Jean had hitchhiked to his home and had stayed there from 2:30 a.m. until 7:00 a.m. Defendant then took her back home. When defendant woke up around 11:00 a.m., he discovered that Jean had stolen cocaine worth approximately $500.00 from him. He drove over to Jean's home and honked the horn. She came out and got into the car. He questioned her about the cocaine, and she repeatedly denied having taken it. He eventually told her to get out of the car and to get away from him, at which time he left. He told Detective Bramlett that he later sold his car in North Carolina because "he knew that the police would be looking for him in that vehicle." As he recalled, Jean was wearing either a black skirt with a red top or a red skirt with a black top on that day. When asked whether defendant had stated how he felt about Jean Sherman during the middle of June 1986, Detective Bramlett replied that defendant had told her that "he was mad at [Jean] . . . because she had taken the cocaine." During the interview, defendant stated that he was still mad at Jean for taking his cocaine.

On 27 September 1986, Jean Sherman's remains were discovered at the edge of a wooded path at a remote corner of a field in the Pilot community of Franklin County. The body was found about two-tenths of a mile from a public road. Investigators additionally discovered various items of jewelry and a black Harley Davidson tank top which had cut marks in it. The medical examiner conclud-

ed, on the basis of injuries to three ribs, that the victim's death was caused by multiple stab wounds. Dental records and the jewelry discovered at the scene confirmed that the remains were those of Jean Sherman. The medical examiner testified that he would estimate that the deceased "had been dead for many weeks . . . certainly not days or a few weeks; it would be many weeks."

Defendant entered Central Prison to begin serving a thirty-year sentence for his drug conviction on 15 December 1986. On 11 January 1988, defendant was charged with the murder of Jean Sherman. On 13 January, the Raleigh *News and Observer* published an article entitled "Wake man charged in '86 stabbing death," which described defendant's arrest and some of the details of the investigation of and circumstances surrounding Jean Sherman's death.

Walter Woolard, a fellow inmate at Central Prison who was later transferred to Eastern Correctional Center, read the newspaper article and wrote a letter two days later to the Attorney General in which he asserted that he had "some valuable information for a guilty verdict" in the case. The contents of the letter read as follows:

Mr. Thornburg. I am an inmate here at Eastern Correctional Center. I was sentenced to fifty years on October the second, 1986, for several counts of arson.

I was taken to Central Prison on October the 9th of '86.

I was reading in the paper the other day where Roger Wayne Franklin was arrested and charged with first degree murder in the death of Jean Marie Sherman. I wanted to let you know that I may have some valuable information for a guilty verdict.

Roger Franklin was assigned to the same dorm that I was in at Central Prison. He was in my dorm until I transferred here on January the 14th of '87.

Roger Franklin and I played cards together and talked about our crimes. He made the statement to me that he had killed a girl before and had never got caught after I told him that arson was an easy crime to get away with.

If you could send someone to talk to me I will be glad to help in any way I can because I can't stand to see someone get out of something when they are in fact guilty. I confessed

to my crimes because I knew I had done them. Anyway, I will be glad to help in any way I can.

I am not a liar and I am an honest person.

Sincerely. Walter Woolard.

P.S. This could be very dangerous for me. I don't want my name in the newspaper. I hope you can use my help.

At trial, Woolard testified that while he and defendant were inmates at Central Prison, they played cards together. One night, Woolard was talking about how much time he had received for his arson conviction and told defendant it was a hard crime to be convicted of, but that he had confessed to it. Defendant then told Woolard that "he had killed a girl before, was questioned about it and got away with it." Defendant also stated, "you ain't never supposed to admit to nothing, you're supposed [to] make them prove it."

Woolard further testified that a week or two after this conversation, Woolard borrowed $7.00 from defendant. Woolard also owed $7.00 to another man, whom he referred to as "the Indian." Woolard asked defendant if he could repay the Indian first because he was scared of the Indian. Defendant then "[got] kind of ill. He said the reason I killed that girl is because she owed me some money. He said it with an attitude, so I went ahead and paid him. . . . He got mad . . . I took it he didn't play with his money, he wanted his."

[1] Defendant initially takes issue with the trial court's denial of his motions to dismiss made at the close of the State's evidence and renewed at the close of defendant's evidence. Defendant contends that the State's evidence was insufficient to support his conviction of first-degree murder or to withstand his motion to dismiss. Specifically, defendant argues that Judge Hobgood's decision to submit to the jury the charge of first-degree murder was improper because there was not substantial evidence that this defendant was in fact the perpetrator of the crime. Although we concede that this is a close question, we have carefully analyzed the facts as they are set out above, excluding the evidence regarding defendant's prior threat for reasons which we set out below, and we conclude that the State's case was sufficient to take the case to the jury.

STATE v. FRANKLIN

[327 N.C. 162 (1990)]

As an initial matter, we note that defendant moved for a dismissal on two separate occasions — once at the conclusion of the State's case and again at the conclusion of all of the evidence. Because defendant introduced evidence at trial on his own behalf, he waived his right to complain on appeal of the denial of his initial motion to dismiss at the conclusion of the State's evidence. *State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988); N.C.G.S. § 15-173 (1983). Accordingly, only the sufficiency of the evidence at the close of all of the evidence is before us here.

Before a trial court may submit a charge of first-degree murder to a jury, there must be substantial evidence of every essential element of the offense charged and that the defendant was the perpetrator of the crime. *State v. Judge*, 308 N.C. 658, 303 S.E.2d 817 (1983). First-degree murder is defined as the unlawful killing of a human being with malice and with premeditation and deliberation. *Id.* As the trial court instructed in this case, premeditation and deliberation may be, and most often are, proved by circumstantial evidence. *State v. Jones*, 303 N.C. 500, 279 S.E.2d 835 (1981). Among the circumstances which give rise to an inference of premeditation and deliberation are the conduct and statements of defendant before and after the killing, attempts to conceal the body, ill will between the parties, and evidence that the killing was performed in a brutal and vicious manner. *Id.*

The question presented on defendant's motion to dismiss is whether, upon consideration of all of the evidence in the light most favorable to the State, there is substantial evidence that the crime charged in the bill of indictment was committed and that defendant was the perpetrator. *State v. Perry*, 316 N.C. 87, 340 S.E.2d 450 (1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Greer*, 308 N.C. 515, 302 S.E.2d 774 (1983). This test is the same whether the State's evidence is direct, circumstantial, or a combination of the two. *State v. Porter*, 303 N.C. 680, 281 S.E.2d 377 (1980).

The trial court need only satisfy itself that the evidence is sufficient to take the case to the jury; it need not be concerned with the weight of that evidence. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). If there is any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction, it is for the jury to say whether it is

STATE v. FRANKLIN

[327 N.C. 162 (1990)]

convinced beyond a reasonable doubt of defendant's guilt. *State v. Batts*, 269 N.C. 694, 153 S.E.2d 379 (1967). The trial court is not required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649.

The State is entitled to every reasonable inference to be drawn from the evidence. Contradictions and discrepancies do not warrant dismissal of the case; rather, they are for the jury to resolve. *State v. Workman*, 309 N.C. 594, 308 S.E.2d 264 (1983). Defendant's evidence, unless favorable to the State, is not to be taken into consideration. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649.

In any criminal case, the State must show that a crime was committed and that the defendant committed the crime. *Id.* There is no doubt in this case that the crime in question was in fact committed. The evidence adduced at the scene establishes that Jean Sherman was murdered. The question that must be decided is whether the State has produced sufficient evidence to establish that defendant was the perpetrator of that crime. Upon our review of the evidence in the light most favorable to the State, disregarding both defendant's evidence and any contradictions or discrepancies in the evidence, we conclude that the State has met its burden. While we concede that the evidence in this case is primarily circumstantial, we cannot say that the State's evidence is so lacking as to any material element that this Court must conclude, as a matter of law, that no reasonable juror could have found defendant guilty beyond a reasonable doubt.

Janet Kelly testified that Jean had stated that she had stolen cocaine worth approximately $1,000 from defendant the evening before he drove her away in his car. While Jean had informed Janet that she intended to return the cocaine to defendant that day, Jean also stated that she had given the drugs to another woman, Kim Carnes, in order to permit the other woman to sell it for her. It is reasonable to infer that Jean did not have the cocaine with her when she met with defendant on the afternoon of 17 June and that defendant was angry about that fact. In fact, defendant told Detective Bramlett that he was mad at Jean for having stolen his cocaine. He admitted to Jean Sherman's mother that he had driven away with Jean that day. Jean was never again seen alive, and the medical examiner testified that when her remains were discovered on 27 September, she had been dead

for "many weeks." The black Harley Davidson tank top she had worn on the date of her disappearance was found, riddled with holes, among her remains. Therefore, a reasonable juror could infer that defendant had both the motive and the opportunity to kill Jean Sherman.

Several circumstances surrounding defendant's actions subsequent to the date of Jean Sherman's disappearance lead to an inference of guilt. The facts that defendant sold his car because he knew the police would be looking for him in that vehicle and that he escaped to Daytona Beach, Florida, constitute relevant evidence of flight. While defendant had other reasons, namely, the outstanding drug warrants, to flee, a reasonable juror might nevertheless view this evidence as some indication of guilt for the crime charged in this case. "[E]ven if [defendant] might have had other reasons for fleeing than consciousness of guilt for the crime for which [he was] being tried, this goes only to the weight, not the admissibility of, the evidence of flight." *State v. Belton*, 318 N.C. 141, 152, 347 S.E.2d 755, 762 (1986). Defendant's comments to Jean Sherman's mother, in which he stated that he would not be put on hold because he thought that the telephone was "bugged or tapped" and in which he demanded that she "get the police off his back," likewise may be weighed into the total equation, as may defendant's evasive actions upon being arrested in Florida.

Defendant's boastful admissions to Walter Woolard during his incarceration for the drug convictions are highly relevant in our determination of whether the State's evidence was sufficient to establish defendant's guilt, especially when taken in conjunction with the other evidence in this case. An admission is a statement of pertinent facts which, in light of other evidence, is incriminating. *State v. King*, 326 N.C. 662, 392 S.E.2d 609 (1990). Our long-established rule of *corpus delicti* stands for the proposition that if there is corroborative evidence, independent of the incriminating statements, defendant may be found guilty of the crime charged. *State v. Trexler*, 316 N.C. 528, 342 S.E.2d 878 (1986). The *corpus delicti* rule applies with equal force to confessions and admissions. *Id.* The *corpus delicti* rule only requires evidence *aliunde* the admission which, when considered with the admission, supports the admission and permits a reasonable inference that the crime occurred. *Id.*

[2]  Where the body is found with marks of violence upon it, as was the case here, such evidence establishes *corpus delicti. State v. Foye,* 254 N.C. 704, 120 S.E.2d 169 (1961). Evidence of *corpus delicti* coupled with the testimony of a cell mate relating inculpatory statements made by the defendant is sufficient to support a conviction. *State v. King,* 326 N.C. at 675, 392 S.E.2d at 617 (1990). In this case, according to Woolard, defendant said that he had killed a girl, had been questioned about it, and had gotten away with it. He further told Woolard that the reason he had killed the girl was because she owed him money. The evidence shows that defendant had previously been questioned about Jean Sherman's disappearance but had not been charged with her murder. The evidence further conclusively shows that Jean Sherman owed defendant money for the cocaine she had stolen on the night before her disappearance. All of this evidence, taken as a whole, is sufficient to take the case to the jury, which was then entitled to evaluate its weight. We conclude that the State's evidence, when viewed in the light most favorable to the State, is sufficient to withstand defendant's motion to dismiss. This assignment of error is overruled.

[3]  Defendant's next assignment of error relates to the trial court's admission of the testimony of McLester Turner regarding defendant's statement to Turner containing a threat to "cut" and "kill" a girl who had stolen drugs from him. As the chronology sets out above, Turner estimated that defendant made this threat at some time between 24 May and 29 May 1986. Turner was not able to ascertain the identity of the woman from defendant; he was only able to determine that the woman had stolen $300.00 in drugs and $800.00 in cash, or vice versa, from defendant on the night before defendant made the threat, and that the woman who later picked up defendant at the job site was not the person of whom he spoke.

It is well established in this state that " '[a] threat to kill or injure someone, not definitely designated, is admissible in evidence, when other facts adduced give individuation to it so that . . . the jury may infer that [the threats] were against deceased.' " *State v. Casey,* 201 N.C. 185, 206, 159 S.E. 337, 348 (1931) (quoting 30 C.J. Homicide § 417 (1923) (now codified as 40 C.J.S. Homicide § 236(b) (1944))). General threats which are not shown to have any reference to the deceased are not admissible. *Casey,* 201 N.C. 185, 159 S.E. 337. "Evidence is inadmissible to show a difficulty

between accused and a third person in no way connected with the victim or offense, or to show accused's state of mind toward such a person . . . ." 40 C.J.S. Homicide § 209 (1944); *see State v. Moore*, 276 N.C. 142, 171 S.E.2d 453 (1970).

The State argues that defendant's threats are admissible for the purpose of showing defendant's motive, premeditation, and deliberation in the killing of Jean Sherman. In homicide cases, threats by the accused are often admitted to identify him as the killer, to disprove accident or justification, or to show premeditation and deliberation. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). The State contends that the evidence does not show conclusively that defendant did not know the victim at the time he made the threats and points out that the victim did in fact steal defendant's cocaine on the night of 16 June or the early morning of 17 June. From these contentions, the State reasons that defendant could have made these threats against Jean Sherman, apparently basing its reasoning upon an assumption that this was not the first time the victim had stolen defendant's cocaine. The State further argues that defendant's threats could be construed as being threats against a class of persons: any woman who stole drugs from him.

Defendant contends that the nature of this particular threat and the circumstances surrounding it do not give rise to an inference that the statements were directed toward the victim; nor does it constitute a class threat. We agree and accordingly find error by the trial court on this issue.

In its ruling on this evidence, the trial court concluded in its order that the evidence offered was relevant under Rules 401 and 402 of the North Carolina Rules of Evidence as evidence of a threat for a specific act which had previously been committed by the victim, that is, that the victim had "ripped him off cocaine or dope and cash." The court noted that the State intended to offer evidence through Janet Kelly regarding Jean's statement during the early morning hours of the day she disappeared that she stole a large amount of cocaine from a man named Wayne, and concluded that this statement of defendant would provide a "corroborative circumstance."

We find the trial court's ruling to be based on an erroneous premise: that Jean's statement on the morning of 17 June would be corroborated by a threat defendant made regarding an incident

STATE v. FRANKLIN

[327 N.C. 162 (1990)]

which occurred approximately three weeks earlier. Nothing in the State's evidence ties defendant's threat, contained in his statement to McLester Turner, to the victim. Even if we were to concede that the evidence introduced was sufficient to create an inference that defendant knew the victim at the time he made the threat, which is questionable,[1] such an inference does not logically give rise to the additional inference that defendant's threats were directed toward the victim. Nowhere in the record is there any indication that Jean Sherman stole drugs from defendant on any occasion other than on the morning of 17 June, approximately three weeks *after* defendant threatened to kill the girl who had stolen his cocaine the night before the threat was made. The evidence is undisputed that the victim's acknowledged theft of defendant's cocaine occurred during the early morning hours of 17 June, the day she rode away with defendant, never to return. The State's evidence, at best, simply disclosed that it might have been possible for the victim to have stolen drugs from defendant on an earlier occasion, before 29 May, thereby precipitating defendant's violent reaction. Such a hypothesis, however, is purely conjectural in its nature.

This threat, because it is directed against a specific person, does not qualify as a class threat. Class threats are defined in *State v. Casey*, 201 N.C. 185, 159 S.E. 337, as threats made by a defendant against a general class of persons to which the deceased belonged. Such threats are prima facie referable to the deceased, although the deceased's name is not mentioned. *Id.* This threat does not fall within such a definition. *See, e.g., State v. Shook*, 224 N.C. 728, 32 S.E.2d 329 (1944) (threat against any officer who might come); *State v. Payne*, 213 N.C. 719, 197 S.E. 573 (1938) (threat against officers of the law); *State v. Casey*, 201 N.C. 185, 159 S.E. 337 (threat against the company that had held up payment to defendant); *State v. Baity*, 180 N.C. 722, 105 S.E. 200 (1920) (threat against any officer who interfered with defendant while he was blockading); *State v. Burton*, 172 N.C. 939, 90 S.E. 561 (1916) (threat to kill the first man that tapped on defendant's door

---

1. The only testimony which would indicate that defendant and the victim knew each other at the time defendant made the threat was the former testimony of Barbara Rose that was used to impeach her testimony at this, defendant's second, trial. At the first trial, Mrs. Rose testified that defendant "came by [the mobile home] every two or three weeks to get [Jean]" and that he "had picked Jean up a time or two before the 17th [of June]." During the present proceeding, Mrs. Rose testified that she did not recall ever having seen defendant before 17 June.

## STATE v. FRANKLIN

[327 N.C. 162 (1990)]

that night); *State v. Teachey*, 138 N.C. 587, 50 S.E. 232 (1905) (threat against any man defendant caught at his woman's house). If defendant's threat in this case had been directed against *any* woman who stole cocaine or money from him, such a threat would have been admissible as a class threat. Such was not the case here.

Because of the circumstantial nature of the evidence against defendant in this case, we must conclude that the introduction of this evidence was unduly prejudicial to defendant. While a defendant's threat against the deceased may be relevant to show malice or criminal intent, a defendant's threat against a third person has no probative value and serves no other purpose than to arouse prejudice and hostility on the part of the jury against the defendant. Evidence of a defendant's prior collateral threat is very damaging, not only because it improperly encourages a jury's guilty verdict on the basis of its hostility against a defendant because of his violent tendencies, but also because it erroneously motivates a jury to find that the defendant may be predisposed to act violently. *See, e.g.*, N.C.G.S. § 8C-1, Rule 404(b) (1988); *People v. Lampkin*, 98 Ill. 2d 418, 457 N.E.2d 50 (1983). There was no proper purpose for introducing this prejudicial evidence. The testimony that defendant threatened to kill the woman who had stolen his drugs was impermissible because its only purpose was to show defendant's propensity for violence. That defendant had acted in accordance with that propensity was the thrust of the prosecutor's argument to the jury:

> [Defendant] was full of venom and hatred out of his worship for cocaine to the extent that he was willing to state to whoever would listen what he would do to people who stole cocaine from him[.]
>
> . . . .
>
> You know, there's a point at which the circumstances outweigh any reasonable doubt, and the circumstances in this case . . . of a man whose mind in late May and early June made cocaine so precious to him that he would kill women addicted to it . . . .
>
> . . . .
>
> He snuffed out her life. He stabbed her as he forecast.

Our review of the record on appeal indicates that defendant's remaining assignments of error are not likely to recur on retrial. We therefore decline to address them.

For the above reasons, we conclude that defendant is entitled to a new trial. We accordingly remand to the Superior Court, Franklin County, for a disposition in accordance with this holding.

New trial.