STATE OF NORTH CAROLINA v. MELVIN CURTIS SMITH

No. COA97-1112

(Filed 7 July 1998)

### 1. Evidence— eyewitness identification—admissibility

There was no error in a second-degree murder prosecution in the trial court's admission of an eyewitness identification where the evidence at the voir dire hearing amply supports the findings, and the findings support the trial court's conclusion that the procedures employed by the Kinston police in obtaining the identification of defendant were not impermissibly suggestive as a matter of law.

### 2. Evidence— sleeping patterns of witness—admissible

The trial court did not err in a second-degree murder prosecution by admitting the testimony of an eyewitness's wife as to her husband's sleeping patterns before and after he identified defendant. The credibility of the identification was at issue and evidence tending to shed light on the witness's moods and sleep patterns throughout the identification process could be deemed relevant in assessing the reliability of the identification.

### 3. Criminal Law— efforts to locate defense witness—sufficiency

Even if a second-degree murder defendant had taken steps to preserve an assignment of error concerning the State's efforts to produce a defense witness, he could not argue that the trial court

**STATE v. SMITH**

[130 N.C. App. 71 (1998)]

failed to assist him in locating and subpoenaing his witness because his only response to the court's statement that the witness could not be found was "Yes, sir" and he did not request a recess, move for a continuance, or request the issuance of a material witness order pursuant to N.C.G.S. § 15A-803.

## 4. Homicide— second-degree murder—sufficiency of evidence—eyewitness identification

The trial court did not err by denying defendant's motion to dismiss a second-degree murder charge at the close of the State's evidence where defendant argued that the eyewitness identification was inherently incredible, but the evidence shows that the eyewitness sat behind the assailant in a taxi cab for approximately eight minutes, looking at the back of the assailant's head, neck, and shoulders; the eyewitness also observed the assailant's profile at one point during the ride; these observations were sufficient to allow him to subsequently identify the assailant based on his arms and shoulders, the shape of his head, and the way his ears stuck out; the credibility and weight to be accorded the identification were for the jury to determine; and the State presented additional evidence of defendant's guilt in the form of his own statements.

Appeal by defendant from judgment entered 10 April 1997 by Judge Howard E. Manning, Jr. in Lenoir County Superior Court. Heard in the Court of Appeals 13 May 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General Thomas O. Lawton, III, for the State.*

*Harrison and Simpson, P.A., by Fred W. Harrison, for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Defendant Melvin Curtis Smith appeals his conviction of second degree murder on the grounds that the State failed to produce sufficient evidence of his guilt. Having reviewed defendant's arguments, we find no error.

The testimony of the State's witnesses tended to show that at approximately 8:00 p.m. on 12 September 1995, Paul Wilson (hereinafter "Wilson") hailed a cab in Kinston, North Carolina. Terrence Jones (hereinafter "Jones"), the cabdriver, already had a passenger

STATE v. SMITH

[130 N.C. App. 71 (1998)]

seated in the front. Wilson sat in back seat behind the passenger. Wilson did not see the passenger's face at any point during the eight-minute ride, but he continually observed the back of the passenger's head, neck and shoulders.

While en route to Wilson's destination, Jones and the passenger engaged in a friendly discussion about sports. Wilson, who was preoccupied with meeting his wife as scheduled, did not pay close attention to the conversation until it became argumentative. The passenger had told Jones to go one way, but Jones proceeded in the opposite direction. This made the passenger angry, so he ordered Jones to pull over. As Jones slowed the vehicle to a stop, the passenger turned toward him, said "Drive, M----- F-----," and struck him in the chest. The force of the blow knocked Jones out of the cab, and Wilson tumbled out to escape being harmed. The passenger, then, slid behind the wheel and sped away. Wilson ran to a nearby house to call 911, but by the time the rescue squad arrived, Jones was dead. The passenger had stabbed Jones in the chest.

On 18 October 1995, Detective Paul Hinson of the Kinston Sheriff's Department went to Wilson's place of employment to show him a photographic line-up, which Hinson had compiled based on information gathered during his investigation of the stabbing. The line-up consisted of six photographs of black males, one of whom was defendant. When Wilson viewed the line-up, he recognized defendant and said, "if [he] didn't know that [defendant] was still doing time, [he] would swear that that was him in that car who killed the cabdriver." Wilson did not make a positive identification at that time.

Wilson was troubled after viewing the line-up, because he believed that defendant was the passenger who had stabbed Jones. Later that evening, Wilson discussed his concerns with his nephew and his wife. During the course of these discussions, Wilson learned that defendant was not in jail when the stabbing occurred, so he went to the police station on 21 October 1995 and asked to see the line-up again. At this second viewing, Wilson told the investigating officer, Detective Jennifer Canady, that he was "almost 100 percent sure" that defendant was the front seat passenger in Jones' cab. To be certain, however, Wilson requested an in-person line-up so that he could view the subjects from the back, to see their necks and shoulders and the shapes of their heads. Wilson returned to the police station on 23 October 1995 and saw two in-person line-ups, each consisting of five black, male subjects. Wilson did not pick anyone out of the first line-

up, but from the second, he positively identified defendant, stating "there's your murderer."

Prior to trial, defendant moved to suppress Wilson's identification testimony on the grounds that the identification procedure was impermissibly suggestive. Following a voir dire hearing, the trial court denied the motion and allowed the jury to consider Wilson's identification testimony. At the close of all the evidence, the case was submitted to the jury. The jury deliberated and found defendant guilty of second degree murder. The trial court sentenced defendant to imprisonment at the North Carolina Department of Corrections for a minimum term of 180 months and a maximum term of 225 months. Defendant appeals.

---

[1] Defendant first assigns error to the trial court's failure to suppress Wilson's eye witness identification, alleging that the identification was not the product of independent recollection, but the result of impermissibly suggestive identification procedures. We cannot agree.

A defendant who moves to suppress an out-of-court eyewitness identification must first show that the identification process was unnecessarily suggestive. *State v. Capps*, 114 N.C. App. 156, 162, 441 S.E.2d 621, 624 (1994). If the defendant successfully makes this showing, he must then prove that under the totality of the circumstances, the suggestive procedures gave rise to a substantial likelihood of irreparable misidentification. *Id.* Where the defendant fails to show that impermissibly suggestive procedures were used in procuring the identification, the inquiry ends, and the trial court need not exclude the identification. *State v. Freeman*, 313 N.C. 539, 544, 330 S.E.2d 465, 471 (1985).

The fact that the identifying witness is acquainted with the defendant does not, by itself, make a photographic line-up impermissibly suggestive. " 'All that is required is that the lineup be a fair one and that the officers conducting it do nothing to induce the witness to select one picture rather than another.' " *Freeman*, 313 N.C. at 545, 330 S.E.2d at 471 (quoting *State v. Grimes*, 309 N.C. 606, 610, 308 S.E.2d 293, 295 (1983)).

In the instant case, the trial court conducted a voir dire hearing to determine the admissibility of Wilson's out-of-court identification. The evidence showed that approximately one month after the incident, Wilson viewed a photographic line-up assembled by the Kinston

police. The line-up contained photographs of six black males, including defendant. When Wilson saw the line-up, he recognized defendant as Jones' front seat passenger from the "muscles in his arms and muscles up here [his shoulders] and the way his head sticks out." Wilson also stated that he was acquainted with defendant, but except for the 12 September 1995 stabbing, it had been at least seven years since he had last seen defendant. Wilson did not positively identify defendant during the initial line-up, because he believed that defendant was "doing time" when the stabbing occurred.

The evidence further showed that Wilson was "bothered" after viewing the initial line-up, and he requested a second look on 21 October 1995. This time, Wilson was "almost 100 percent sure" that defendant was the killer, but "because he didn't want to accuse anybody unfairly," he asked to see an in-person line-up so that he could view the subjects from the back. At the 23 October 1995 in-person line-up, Wilson positively identified defendant as the "murderer." Explaining the basis for his identification, Wilson stated,

> I could see the back of his head and the way his ears stuck out and the way he had leaned his head as I was looking at him and his shoulders. And I was positive that that was the one.

Over the course of the investigation, Wilson viewed 50 to 75 pictures in police "mug books," two photographic line-ups, and two in-person line-ups. At no time did Wilson identify anyone other than defendant. Moreover, there was no evidence whatsoever that the police said or did anything to induce Wilson to choose defendant over another individual.

Upon these facts, the trial court found that "Wilson's identification of [defendant] was not obtained as a result of procedures that were unnecessarily suggestive or conducive to irreparable mistake and misidentification." The trial court further found that "[w]hile Wilson's identification of [defendant] is not 'strong,' his credibility is for the jury to determine, together will [sic] all other facts and circumstances at trial." The evidence adduced at the voir dire hearing amply supports these findings; thus, they are conclusive on appeal. These findings, likewise, support the trial court's conclusion that the procedures employed by the Kinston police in obtaining the identification of defendant were not impermissibly suggestive as a matter of law. Accordingly, we overrule defendant's first assignment of error. Furthermore, in light of our decision, we need not consider defendant's second and third assignments of error, which are based on the

premise that Wilson's identification of defendant resulted from impermissibly suggestive procedures.

[2] We turn now to defendant's fourth assignment of error, by which he objects to the admission of Jacqueline Wilson's testimony regarding her husband's sleeping patterns before and after he identified defendant. Defendant contends that this evidence was irrelevant and inadmissible under Rules 401 and 402 of the North Carolina Rules of Evidence. Alternatively, defendant argues that the evidence should have been excluded under Rule 403 on the grounds that its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." N.C.R. Evid. 403. Again, we are not persuaded.

Relevant evidence is that which has any tendency to prove "any fact that is of consequence to the determination of the action." N.C.R. Evid. 401. Our Courts have broadly construed this definition and have given trial courts considerable freedom in determining relevance and admissibility. *See State v. Wallace,* 104 N.C. App. 498, 410 S.E.2d 226 (1991) (stating that "even though a trial court's rulings on relevancy technically are not discretionary . . . such rulings are given great deference on appeal"). Likewise, the question of whether to exclude evidence under Rule 403 is entrusted to the sound discretion of the trial court, and its decision in this respect will not be overturned absent a manifest abuse of that discretion. *State v. Cagle,* 346 N.C. 497, 506-07, 488 S.E.2d 535, 542, *cert. denied,* 139 L. Ed. 2d 614, 66 U.S.L.W. 3417 (U.S.N.C. Dec. 15, 1997) (No. 97-6543).

In the present case, the credibility of Wilson's identification of defendant was at issue. Therefore, evidence tending to shed light on Wilson's moods and sleep patterns throughout the identification process could be deemed relevant in accessing the reliability of the identification. Wilson's wife described his behavior in the weeks following the incident as "walking around in circles," "talking [things] over [to] himself," "nervous," "sweating," and "really upset." Regarding Wilson's sleep patterns during that time, Mrs. Wilson testified as follows:

> He would go to sleep and wake up in a fright. He would also be mumbling things like . . . help me, help me. And you could hear him struggling, tossing and turning. He'd wake up in a cold sweat. He would—it really was on his conscience what was going on.

Later, when Wilson positively identified defendant in the in-person line-up, Mrs. Wilson observed that "[h]e looked like . . . a burden had

been lifted off his shoulders." She stated that he was no longer agitated and that he no longer had trouble sleeping. She noted that the night of the in-person line-up "was really about the first night that he really got a good night's sleep." Defendant has not shown, and we do not perceive, any unfair prejudice resulting from this testimony. Thus, we conclude that the trial court committed no error in admitting Mrs. Wilson's testimony, and defendant's fourth assignment of error is denied.

[3] Next, defendant assigns error to the trial court's "fail[ure] to take action to ensure that the witness, Latisha Graham, aka Altisha Graham, was present in order to testify for defendant." A review of the record, however, reveals that defendant took no action to preserve this question for our review. This notwithstanding, defendant's argument is wholly without merit.

Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure requires a party to make a "timely request, objection, or motion" during the proceedings in order to preserve an issue for review. N.C.R. App. P. 10(b)(1). Failure to do so constitutes a waiver of the right to raise the issue on appeal. *State v. Eason*, 328 N.C. 409, 402 S.E.2d 809 (1991). In this case, defendant issued a subpoena requesting that Graham appear and testify on his behalf. Concerning the efforts made to produce Graham's attendance, the trial court noted the following for the record:

> I asked the Sheriff's Department and the Police Department to see if they could locate Ms. Graham who has not responded to [defense counsel's] subpoena and as of the present time, she is unavailable. We can't find her [.]

Defendant's only response to this statement was "Yes, sir." He did not request a recess, move for a continuance, or request the issuance of a material witness order pursuant to North Carolina General Statutes section 15A-803. Since defendant failed to avail himself of the methods to secure Graham's attendance, he cannot now argue that the trial court failed to assist him in locating and subpoenaing his witness. *See State v. Poindexter*, 69 N.C. App. 691, 700, 318 S.E.2d 329, 334 (1984) (finding no merit to defendant's argument that the trial court failed to assist him where defendant failed "to make the necessary motions and applications to secure the presence of an unwilling witness"). Furthermore, our Supreme Court has made it abundantly clear that a defendant " 'may not place the burden on the officers of the law and

the court to see that he procures the attendance of witnesses and makes preparation for his defense.'" *State v. Tindall*, 294 N.C. 689, 700, 242 S.E.2d 806, 813 (1978) (quoting *State v. Graves*, 251 N.C. 550, 558, 112 S.E.2d 85, 92 (1960)). Thus, even had defendant taken steps to preserve this assignment of error, there would be no merit to his argument.

**[4]** Defendant's final assignment of error is the trial court's denial of his motion to dismiss the murder charge at the close of the State's evidence. Defendant argues that this ruling was error, because Wilson's identification was inherently incredible, and thus, the evidence of defendant's guilt was legally insufficient. We must disagree, as there was ample evidence in the record to support a finding that defendant perpetrated the murder of Jones.

"In ruling upon a motion to dismiss, the trial court must determine whether, 'upon consideration of all of the evidence in the light most favorable to the State, there is substantial evidence that the crime charged . . . was committed and that defendant was the perpetrator.'" *State v. Beasley*, 118 N.C. App. 508, 511-12, 455 S.E.2d 880, 883 (1995) (quoting *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990)). Questions of credibility and the proper weight to be given eyewitness identification testimony are for the jury to decide. *Id.* "In determining whether a witness' identification testimony is inherently incredible requiring dismissal, the test is whether 'there is a reasonable possibility of observation sufficient to permit subsequent identification.'" *Id.* (quoting *State v. Turner*, 305 N.C. 356, 363, 289 S.E.2d 368, 372 (1982) (citation omitted)).

The evidence shows that Wilson sat behind Jones' assailant in a taxicab for approximately eight minutes, looking at the back of his head, neck, and shoulders. At one point during the ride, Wilson also observed the assailant's profile. These observations were sufficient to allow Wilson to subsequently identify the assailant based on "the muscles in his arms [and shoulders]," the shape of his head, and "the way his ears stuck out." Wilson's credibility and the weight to be accorded his identification testimony were for the jury to determine. Therefore, defendant has failed to show that the identification evidence was inherently incredible. *See State v. Murphy*, 56 N.C. App. 771, 773, 290 S.E.2d 408, 409 (1982) (holding that identification not inherently incredible where victim did not see attacker's face, which was covered with something plastic, but identified him based on "the sound of his voice and the size and shape of him").

Moreover, the State presented additional evidence of defendant's guilt in the form of his own statements. Several weeks after the murder, defendant was in Pitt County detention center on other charges, when he encountered an acquaintance, Enrico Cotton, who told defendant that the police believed he had murdered Jones. According to Cotton, defendant replied that "he weren't worrying about that [expletive], . . . because they ain't got no murder weapon; they ain't got no case." During the same period, defendant wrote a letter to his girlfriend stating the he would "be home soon to take care of [his] murders." This evidence, together with Wilson's identification testimony, and taken in the light most favorable to the State, was legally sufficient to overcome defendant's motion to dismiss. Accordingly, defendant's final assignment of error fails.

Based upon all of the foregoing stated reasons, we conclude that defendant received a fair trial, free from prejudicial error.

No error.

Judges GREENE and MARTIN, Mark D., concur.