DAVIS, Judge.
Gary Winston Sells, Sr. ("Defendant") appeals from his convictions of two counts of first-degree murder. On appeal, he contends that the trial court erred in (1) denying his motion to dismiss; and (2) excluding exculpatory evidence that he sought to introduce. After careful review, we conclude that Defendant received a fair trial free from prejudicial error.
Factual Background
The State presented evidence at trial tending to establish the following facts: On 8 March 2009 at 1:53 a.m., Chris Smith ("Smith") returned to the home of his grandmother, Shirley Rummage ("Rummage"), at 528 North First Street in Albemarle, North Carolina where he lived with Rummage, his uncle, Ricky Lowder ("Lowder"), and Defendant. Defendant had previously dated Rummage for a period of 25 years and still lived at her home. As Smith approached the house, he observed Defendant standing in the front yard next to Rummage's car with the keys to both the vehicle and Rummage's house in his hand.
Smith asked Defendant what he was doing, and Defendant informed him that Rummage and Lowder were dead and that their bodies were inside the house. Smith took Rummage's keys from Defendant, unlocked the door, and went inside. Upon entering the kitchen, Smith discovered Rummage's and Lowder's bodies and saw that they appeared to have been shot to death. Smith then called 911.
Officers George Frazee ("Officer Frazee") and Adam Torres ("Officer Torres") with the Albemarle Police Department ("APD") responded and arrived at the residence two to four minutes later. Upon their arrival, the officers encountered Defendant and Smith in the front yard. Officers Frazee and Torres then entered the house and discovered the bodies of Rummage and Lowder.
Shortly thereafter, EMS personnel arrived at the scene. David White ("White"), an EMS paramedic, inspected the bodies of Rummage and Lowder and determined that they were both dead. When he attempted to take Rummage's pulse, White noted that rigor mortis had already begun to set in.
Smith asked Officer Frazee if he could retrieve a phonebook from inside the house in order to make some calls. Officer Frazee responded that Smith could not go inside but that he would go get the phonebook and bring it to Smith. Smith informed Officer Frazee that the phonebook was located in Defendant's room in his nightstand. Officer Frazee then entered Defendant's bedroom and discovered an empty pistol holster in Defendant's nightstand drawer but did not find the phonebook. Upon returning to the front yard, Officer Frazee told Smith that the phonebook was not there. Smith asked Officer Frazee whether "the .45 [was] in there" to which Officer Frazee did not respond. Smith then stated "[t]here should be a Kimber .45 in the drawer." Smith then turned to Defendant and asked him where his Kimber .45 caliber pistol was. Defendant responded that "it was gone."
Subsequently, Captain Jeffrey Swink with the APD arrived and took control of the crime scene. In searching the yard behind the house, he discovered a Kimber .45 caliber pistol, which was ultimately shown to be the pistol missing from Defendant's room, and-based on ballistics testing-the pistol used to murder Rummage and Lowder.
On 6 July 2009, Defendant was indicted on two counts of first-degree murder. A jury trial was held in Stanly County Superior Court beginning on 24 March 2014 before the Honorable W. Erwin Spainhour.
The State introduced DNA evidence tending to show that Defendant's DNA profile was found on the Kimber .45 used to shoot Rummage and Lowder. Sharon Hinton, a DNA analyst with the North Carolina State Crime Lab, provided expert testimony confirming that the only DNA profile found on the pistol was that of Defendant.
In addition, the State provided the testimony of Special Agent Christie Hearn ("Agent Hearn"), a special agent with the State Bureau of Investigation, who conducted several interviews with Defendant along with APD Detective John Broadway ("Detective Broadway") both prior to and after Defendant's arrest. Agent Hearn testified that Defendant's various accounts of the events on the night of the shooting were not identical but that Defendant maintained (1) the murders of Rummage and Lowder were committed by an individual requesting to see Lowder (or committed by one of that individual's accomplices), who Defendant let into the house "some time after midnight"; and (2) from his bedroom, he heard shots from the kitchen and then saw the man (or men) flee immediately before Smith returned home.
During his case-in-chief, Defendant attempted to introduce evidence through the testimony of Rodney Lockhart ("Lockhart"), an inmate, that Smith had admitted to Lockhart that he was the actual perpetrator of the murders of Rummage and Lowder. The trial court conducted a voir direexamination of Lockhart outside of the presence of the jury and ultimately ruled that it would not allow Lockhart's testimony because it was unreliable.
At the close of the State's evidence and at the close of all the evidence, Defendant's trial counsel moved to dismiss based on insufficiency of the evidence. The trial court denied both motions.
Defendant was convicted by the jury of both charges. The trial court sentenced him to two consecutive life sentences without the possibility of parole. Defendant gave oral notice of appeal in open court.
Analysis
I. Motion to Dismiss
Defendant first argues that the trial court erred in denying his motion to dismiss. Specifically, he contends that because the State failed to show that his DNA could only have been impressed upon the murder weapon at the time when the offenses were committed, the trial court was required to grant his motion to dismiss based on a lack of sufficiency of the evidence. We disagree.
"When reviewing a defendant's motion to dismiss, this Court determines only whether there is substantial evidence of (1) each essential element of the offense charged and of (2) the defendant's identity as the perpetrator of the offense. Whether the evidence presented at trial is substantial evidence is a question of law for the court. Appellate review of a denial of a motion to dismiss for insufficient evidence is de novo." State v. Fisher,---N.C.App. ----, ----, 745 S.E.2d 894, 900-01 (internal citations and quotation marks omitted), disc. review denied,367 N.C. 274, 752 S.E.2d 470 (2013).
In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.
State v. Fritsch,351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (internal citations and quotation marks omitted), cert. denied,531 U.S. 890, 148 L.Ed.2d 150 (2000).
"If there is any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction, it is for the jury to say whether it is convinced beyond a reasonable doubt of defendant's guilt." State v. Franklin,327 N.C. 162, 171-72, 393 S.E.2d 781, 787 (1990). However, "[i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed." State v. Scott,356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (citation omitted).
It is well established that "[t]he elements of first-degree murder are: (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." State v. Wiggins,210 N.C.App. 128, 140, 707 S.E.2d 664, 673 (citation and quotation marks omitted), disc. review denied,365 N.C. 189, 707 S.E.2d 242 (2011).
In the present case, Defendant cites our holding in State v. Carver,221 N.C.App. 120, 725 S.E.2d 902 (2012), aff'd per curiam,366 N.C. 372, 736 S.E.2d 172 (2013), for the proposition that DNA evidence found at a crime scene cannot, without more, be the basis for withstanding a defendant's motion to dismiss unlessit is shown to have been imprinted at the time of the commission of the crime. Id.at 122-23, 725 S.E.2d at 904-05. He then seeks to rely on this principle, arguing that he freely conceded that he had handled the gun "repeatedly over several years" and that, as such, the mere fact that his DNA profile was found on the Kimber .45 caliber pistol was insufficient to allow the jury to find him guilty of the murders.
The flaw with Defendant's argument is that even assuming arguendothat the DNA evidence found on the gun was not by itself sufficient to overcome his motion to dismiss, the State presented other evidence at trial-discussed more fully below-that allowed the first-degree murder charges to be taken to the jury.
Rummage's daughter, Wanda Rummage ("Wanda"), testified that (1) Defendant had threatened Rummage and her family; and (2) Rummage was afraid that Defendant would kill her and Lowder. Specifically, she testified, in pertinent part, as follows:
Q. And about-Well, let me back up for a second. At the time of [Rummage's] death were you familiar with the nature of what her relationship was with [Defendant]?
A. She wanted him out of her house.
....
Q. During the years, months and weeks leading up to her death, did you have the opportunity to talk with your mother and observe her moods and her concerns and fears?
A. Yes. I talked to her quite often. I didn't talk to her daily, with the shift that I worked. But I would talk to her a couple of times a week. My days off I would come up and see her. We would go out to eat.
Q. And during the course of your knowing the defendant in this case, Mr. Gary Sells, did you have an opportunity to observe his relationship with your brother Ricky Lowder?
A. Yes, I did.
Q. And did you ever hear the defendant make any statements about your brother Ricky Lowder?
A. He was always making comments on my brother. He despised my brother. He really wasn't worth living; he should [sic] be breathing; he should kill him. Just-It was all day if he was around him. If my brother came in the room, or in the house, all it took was for him to see Ricky and he had issued [sic] with him. It was instant.
Q. And when you were there and you observed those interactions, what would Ricky do?
A. Ricky paid him no attention.
Q. Did your mom talk about what her concerns were about Ricky and [Defendant's] relationship?
....
A. She was-Yeah, we talked about his comments about Ricky. And she was afraid he was going to hurt Ricky. He was always talking about he wanted to kill him, and she was afraid he was going to kill him.
Defendant then introduced into evidence a statement Wanda had previously made to Detective Broadway in an apparent attempt to impeach her credibility. On redirect examination, the State questioned Wanda on the contents of her prior statement:
Q. Read that again.
A. "[Rummage] has told me that [Defendant] said he could kill us all-her kids. And that he was too smart-there's words missing-to catch."
Q. If you could go down to the bottom of that page and read that sentence.
A. "[Defendant] had threatened every one of my family."
Q. So those threats are in there; is that correct?
A. Yes, ma'am.
In addition to this evidence that Defendant had a motive to kill Rummage and Lowder, Defendant was also shown to have had the opportunity to commit the murders based on his own admission that he was in the house when the murders were committed. Agent Hearn testified as follows concerning the account of the events given to her and Detective Broadway by Defendant:
Q. What, if anything, did he tell yourself and Detective Broadway had happened?
A. He advised that a white male had come to the door and knocked on the door. That he had been lying on his bed watching television in his bedroom-which, for illustrative purposes, was the first room on the left as you come in the front door.
And he said he got up and went and answered the door, and the white male asked if Ricky was there. And he said, "Yeah; he's in the back room." And the white male came in.
[Defendant] said he kind of took a few steps toward the area to point him in the direction of where the room was located where Ricky was. And that at that time [Rummage] was standing in the area there at the sink, and kind of whispered to him, "Who's that?" And [Defendant] told her he didn't know.
He said he went back to his bedroom and started watching television. Said he could hear them talking, but didn't know what they were saying. And at one point heard them walking from the den or living room area into the kitchen, and heard the white male-or heard a comment made 'I've heard that before' or 'you've said that before'. He said it was said in a normal tone of voice.
Then he saw the white male and Ricky walking back toward the front door. And the white male was in front, and Ricky was in the back.
He said he heard the storm door open. There were two doors at the residence. And he clarified that when the white male had come to the front door, that the wooden interior door was already open-it was standing open. So when he went to the door, he just opened the storm door.
So he said he heard the door open. Obviously he couldn't see, but he heard the door open. And he said he saw Ricky come walking back by, headed toward the kitchen or facing the kitchen. And when he got about midway of the entrance of his bedroom, Ricky kind of turned around at his waist and looked in [Defendant's] direction.
And he said about that time he heard fast gunshots. And he said he just kind of froze. He didn't hear Ricky hit the floor. He didn't hear [Rummage] hit the floor.
He said he started to get up, but then he just kind of froze and waited for a little bit. And then looked out the blinds-or the blind for the window that faces out toward the roadway from his bedroom.
And he said when he looked out, he saw three people. He saw the white male that had been inside the house, another gentleman that he thought was a white male based on their features on the sidewalk area headed down toward the street. And he saw another male who he thought was a white male coming from the carport area that was located there to the left of the residence. And that all three of them got into the dark colored SUV that was parked out front.
And he said he saw the SUV when the white male had come and knocked on the door, but he had not seen anyone else and didn't realize anyone else was there until he saw them leaving.
He said they all three got into the dark colored SUV, and the SUV left at a normal rate of speed with the lights on.
Therefore, by virtue of Defendant's own statements to law enforcement officers, the State sufficiently demonstrated that he was in the house at the time of the murders and, therefore, had the opportunity to shoot Rummage and Lowder. See State v. Hayden,212 N.C.App. 482, 488, 711 S.E.2d 492, 497 ("In order for this Court to hold that the State has presented sufficient evidence of defendant's opportunity to commit the crime in question, the State must have presented at trial evidence not only placing the defendant at the scene of the crime, but placing him there at the time the crime was committed."), disc. review denied,365 N.C. 349, 717 S.E.2d 737-38 (2011).
We have held that where the State demonstrates that the defendant had both motive and opportunity to commit a crime, the trial court's denial of the defendant's motion to dismiss is proper.
The case law clearly shows that no singular combination of evidence, nor any finite, quantifiable amount of evidence constitutes substantial evidence. Once the court has determined that the evidence of motive and opportunity as a whole surmounts the initial benchmark of sufficiency, the task of assessing the value and weight of that evidence is for the jury. Factually, this Court does not interpret a lack of certain types of evidence as somehow negating defendant's guilt.
State v. Miles,222 N.C.App. 593, 603-04, 730 S.E.2d 816, 825 (2012) (internal citation omitted), aff'd per curiam,366 N.C. 503, 750 S.E.2d 833 (2013).
Here the State presented evidence that (1) Rummage was going to tell Defendant to leave her home; (2) Rummage was afraid of Defendant; (3) Defendant had previously threatened to kill Rummage and Lowder; (4) Defendant admitted to Agent Hearn and Detective Broadway that he was at the scene of the crime at the time of the shootings; (5) Rummage and Lowder were shot with Defendant's Kimber .45 caliber pistol-which was missing from the empty holster found in his nightstand-and later discovered in the yard behind the house; and (6) the only DNA profile found on the Kimber .45 belonged to Defendant. We cannot agree with Defendant's assertion that all of this evidence merely "raised suspicion and permitted conjecture" as to Defendant's guilt.
Accordingly, we conclude that the State presented sufficient evidence to raise a jury question as to the first-degree murder charges. Defendant's argument on this issue is therefore overruled.
II. Admissibility of Exculpatory Evidence
Defendant next argues that the trial court erred in excluding the testimony of Lockhart, which Defendant sought to introduce under Rule 804(b)(3) or, alternatively, Rule 804(b)(5) of the North Carolina Rules of Evidence, concerning an alleged admission by Smith to Lockhart that Smith had murdered Rummage and Lowder. We disagree.
"The standard of review for this Court assessing evidentiary rulings is abuse of discretion. A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." State v. Hagans,177 N.C.App. 17, 23, 628 S.E.2d 776, 781 (2006) (internal citations and quotation marks omitted).
During a voir direexamination conducted outside the presence of the jury, Lockhart testified as follows:
Q. And do you remember giving this statement to Detective Cook?
A. Yes, I do.
Q. And if you look down the first page, to the left, the sentence starts with 'Snuffy'.[1] Do you recall that?
A. Yes.
Q. Can you read that into the record, please? A. Right where it says 'Snuffy was-'
Q. "Snuffy and I-" Yes, sir.
A. "Snuffy and I was sitting on the love seat straightaway in the door. Snuffy shot up, and then we was talking. While we were talking, Snuffy said that he got away with some shit. And I said 'what are you talking about'. He said 'I got away with two murders'. Snuffy said 'that is how slick I am; they won't never know it was me'. Then he started shooting up again."
Q. Is that true?
A. Yeah.
Q. Is that what he told you?
A. Yeah.
....
Q. Had he been doing drugs prior to telling you that?
A. Yes.
....
Q. Did he ever mention who the two people were to you?
A. I just know he had said it was a woman. But he never mentioned, you know, the other person.
Q. Do you recall anything else about that conversation?
A. No. I know he said, you know, he used a revolver. That's the best type of weapon, you know. Can't find the shell casings, or whatever.
THE REPORTER: I'm sorry; I didn't hear that.
THE WITNESS: That he used a revolver because it was good to get away with it, I guess. Forensics on it, shell casings, or whatever. Shells still be inside the pistol.
....
THE COURT: You're sure about that revolver-that's what he said?
THE WITNESS: Yeah.
THE COURT: You're positive?
THE WITNESS: Positive.
The trial court refused to admit this testimony, commenting before the voir direexamination that "I mean, I just find this is inherently incredible, unreliable, and is not going to be admitted. Exception is noted." Following Lockhart's voir diretestimony, the trial court reiterated its refusal to allow this evidence, stating that "[w]ell, the Court reaffirms, and with more emphasis, the earlier ruling objecting to this witness as a possible witness."
A. Rule 804(b)(3)
Pursuant to Rule 804(b)(3),
[t]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness[2] :
....
Statement Against Interest.-A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.
N.C.R. Evid. 804(b)(3).
Admission of evidence under Rule 804(b)(3) requires that (1) the statement must be against the declarant's penal interest; and (2) the trial judge must find that corroborating circumstances ensure the trustworthiness of the statement. State v. Dewberry,166 N.C.App. 177, 181, 600 S.E.2d 866, 869 (2004). Satisfying the second prong requires an independent, nonhearsay indication of the trustworthiness of the statement. Id.This determination is within the sound discretion of the trial court, and broad discretion must be given to the trial judge in determining the reliability of the declaration and the declarant. Id.at 181-82, 600 S.E.2d at 869-70. In making such a determination, the trial court considers factors including (1) the spontaneity of the declaration; (2) the relationship between the defendant and the declarant; (3) existence of corroborative evidence; (4) whether or not the declaration was subsequently repudiated; and (5) whether or not the declaration was in fact against the penal interests of the declarant. Id.at 182, 600 S.E.2d at 869-70. The facts and circumstances surrounding the commission of the crime and the making of the declaration must corroborate the declaration and indicate the probability of trustworthiness. Id.at 182, 600 S.E.2d at 870.
In the present case, Defendant has failed to show that the trial court's exclusion of Lockhart's testimony constituted an abuse of discretion. Given the dubious circumstances surrounding Smith's alleged statement and the fact that he neither expressly mentioned Rummage or Lowder by name nor otherwise provided specific information sufficient to establish that the victims of the murders he had allegedly committed were Rummage and Lowder, we cannot say the trial court abused its discretion by deeming the evidence untrustworthy.
Moreover, rather than establishing the trustworthiness of Smith's alleged statement, the evidence of record-including Defendant's own pre-trial statements and the testimony of Agent Hearn and Detective Broadway-actually undermines its reliability. Perhaps most significantly, Defendant told law enforcement officers that Smith arrived at Rummage's residence afterRummage and Lowder were already dead and that an unknown male came to the door that night and either that person or his accomplices killed Rummage and Lowder.
Furthermore, Lockhart admitted that (1) Smith never identified who he purportedly shot; (2) Smith did not tell Lockhart where or when the crime he was confessing to had occurred; and (3) Smith was using drugs at the time he made the statement. Finally, Lockhart was adamant that Smith had stated that he used a revolver to commit the murders whereas the murder weapon used in the shooting deaths of Rummage and Lowder was not a revolver.
Accordingly, Defendant has failed to show the trial court abused its discretion by refusing to admit Lockhart's testimony under Rule 804(b)(3). See State v. Wardrett,145 N.C.App. 409, 416, 551 S.E.2d 214, 219 (2001) (finding no abuse of discretion where trial court refused to admit testimony of three witnesses that individual other than defendant had committed subject murder under Rule 804(b)(3) given lack of "any other independent evidence offered at trial, aside from the excluded testimony in question, establishing corroborating circumstances which would clearly indicate the trustworthiness of the statements").
B. Rule 804(b)(5)
We likewise reject Defendant's alternative argument that the trial court committed reversible error by not admitting Lockhart's testimony under the catchall exception contained in Rule 804(b)(5).
Rule 804(b)(5) states, in pertinent part, as follows:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
....
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
N.C.R. Evid. 804(b)(5).
Our Supreme Court has articulated a multi-pronged test for trial courts to utilize when considering the admissibility of statements under Rule 804(b)(5).
First, the trial court must find that the declarant is unavailable. Second, the trial court must conduct a six-prong inquiry to determine admissibility. The trial court must consider the following:
(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;
(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4) ;
(3) That the statement possesses equivalent circumstantial guarantees of trustworthiness;
(4) That the proffered statement is offered as evidence of a material fact;
(5) Whether the hearsay is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means; and
(6) Whether the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
State v. Fowler,353 N.C. 599, 608-09, 548 S.E.2d 684, 692-93 (2001) (internal citations, quotation marks, and brackets omitted), cert. denied,535 U.S. 939, 152 L.Ed.2d 230 (2002), overruled in part on other grounds by State v. Tanner,364 N.C. 229, 695 S.E .2d 97 (2010).
In Phillips & Jordan Inv. Corp. v. Ashblue Co.,86 N.C.App. 186, 357 S.E.2d 1, disc. review denied,320 N.C. 633, 360 S.E.2d 92-93 (1987), we stated the following regarding the need for a trial court to make findings based on its application of these factors:
The six-part inquiry is very useful when an appellate court reviews the admission of hearsay under Rule 804(b)(5).... However, its utility is diminished when an appellate court reviews the exclusion of hearsay. Common sense dictates that if proffered evidence fails to meet the requirements of one of the inquiry steps, the trial judge's findings concerning the preceding steps are unnecessary.
Although we are compelled to hold that the trial court erred by not making specific findings for each step in the six-part [Rule 804(b)(5) ] inquiry, the error did not prejudice defendant because the evidence would still have been excluded.
Id.at 191, 357 S.E.2d at 3-4.
The same is true here. While the trial court should have made findings as to each prong of the Rule 804(b)(5) test, its failure to do so was not prejudicial to Defendant. Had the trial court made the required findings, the evidence would still have been excluded given the trial court's determination that Lockhart's proposed testimony lacked trustworthiness and the ample grounds supporting that conclusion. Therefore, Defendant is unable to show reversible error.
Conclusion
For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.
NO PREJUDICIAL ERROR.
Report per Rule 30(e).
Judges BRYANT and INMAN concur.
Opinion
Appeal by defendant from judgments entered 4 April 2014 by Judge W. Erwin Spainhour in Stanly County Superior Court. Heard in the Court of Appeals 7 April 2015.

"Snuffy" was an alias used by Smith.

Smith was deceased at the time of trial.